# HAMPTON, AKA BYERS v. UNITED STATES

No. 74–5822.   Argued December 1, 1975—Decided April 27, 1976

REHNQUIST, J., announced the Court's judgment and delivered an opinion, in which BURGER, C. J., and WHITE, J., joined. POWELL, J., filed an opinion concurring in the judgment, in which BLACKMUN, J., joined, *post*, p. 491. BRENNAN, J., filed a dissenting opinion, in which STEWART and MARSHALL, JJ., joined, *post*, p. 495. STEVENS, J., took no part in the consideration or decision of the case.

*David A. Lang,* by appointment of the Court, 421 U. S. 945, argued the cause and filed a brief for petitioner *pro hac vice.*

*Deputy Solicitor General Jones* argued the cause for the United States. With him on the brief were *Solicitor General Bork, Assistant Attorney General Thornburgh,* and *Jerome M. Feit.*

MR. JUSTICE REHNQUIST announced the judgment of the Court in an opinion in which THE CHIEF JUSTICE and MR. JUSTICE WHITE join.

This case presents the question of whether a defendant may be convicted for the sale of contraband which he procured from a Government informant or agent. The Court of Appeals for the Eighth Circuit held he could be, and we agree.

I

Petitioner was convicted of two counts of distributing heroin in violation of 21 U. S. C. § 841 (a)(1) in the United States District Court for the Eastern District of Missouri and sentenced to concurrent terms of five years' imprisonment (suspended).[1] The case arose from two sales of heroin by petitioner to agents of the Federal Drug Enforcement Administration (DEA) in St. Louis on February 25 and 26, 1974. The sales were arranged by one Hutton, who was a pool-playing acquaintance of petitioner at the Pud bar in St. Louis and also a DEA informant.

According to the Government's witnesses, in late February 1974, Hutton and petitioner were shooting pool

---

[1] Petitioner was placed on five years' probation which was to run concurrently with the remainder of a 28- to 30-year state armed robbery sentence from which petitioner had escaped.

at the Pud when petitioner, after observing "track" (needle) marks on Hutton's arms told Hutton that he needed money and knew where he could get some heroin. Hutton responded that he could find a buyer and petitioner suggested that he "get in touch with those people." Hutton then called DEA Agent Terry Sawyer and arranged a sale for 10 p. m. on February 25.[2]

At the appointed time, Hutton and petitioner went to a prearranged meetingplace and were met by Agent Sawyer and DEA Agent McDowell, posing as narcotics dealers. Petitioner produced a tinfoil packet from his cap and turned it over to the agents who tested it, pronounced it "okay," and negotiated a price of $145 which was paid to petitioner. Before they parted, petitioner told Sawyer that he could obtain larger quantities of heroin and gave Sawyer a phone number where he could be reached.

The next day Sawyer called petitioner and arranged for another "buy" that afternoon. Petitioner got Hutton to go along and they met the agents again near where they had been the previous night.

They all entered the agents' car, and petitioner again produced a tinfoil packet from his cap. The agents again field-tested it and pronounced it satisfactory. Petitioner then asked for $500 which Agent Sawyer said he would get from the trunk. Sawyer got out and opened the trunk which was a signal to other agents to move in and arrest petitioner, which they did.

Petitioner's version of events was quite different. According to him, in response to his statement that he was short of cash, Hutton said that he had a

---

[2] The testimony of Hutton is confused as to the dates. At one point he indicated that the initial conversation and the sale both occurred on February 25. At another point he testified that they occurred on two separate days.

friend who was a pharmacist who could produce a non-narcotic counterfeit drug which would give the same reaction as heroin. Hutton proposed selling this drug to gullible acquaintances who would be led to believe they were buying heroin. Petitioner testified that they successfully duped one buyer with this fake drug and that the sales which led to the arrest were solicited by petitioner[3] in an effort to profit further from this ploy.

Petitioner contended that he neither intended to sell, nor knew that he was dealing in heroin and that all of the drugs he sold were supplied by Hutton. His account was at least partially disbelieved by the jury which was instructed that in order to convict petitioner they had to find that the Government proved "that the defendant knowingly did an act which the law forbids, purposely intending to violate the law." Thus the guilty verdict necessarily implies that the jury rejected petitioner's claim that he did not know the substance was heroin, and petitioner himself admitted both soliciting and carrying out sales. The only relevance of his version of the facts, then, lies in his having requested an instruction embodying that version.[4] He did not request a standard entrapment instruction but he did request the following:

> "The defendant asserts that he was the victim of entrapment as to the crimes charged in the indictment.

---

[3] On appeal, petitioner's counsel, who was also his counsel at trial, conceded that petitioner was predisposed to commit this offense. 507 F. 2d 832, 836 n. 5 (CA8 1974).

[4] The Court of Appeals treated the proffered instruction on its merits, rather than inquiring as to whether its refusal, in light of the other instructions given and of the jury's verdict, may have been harmless error. We therefore do likewise.

"If you find that the defendant's sales of narcotics were sales of narcotics supplied to him by an informer in the employ of or acting on behalf of the government, then you must acquit the defendant because the law as a matter of policy forbids his conviction in such a case.

"Furthermore, under this particular defense, you need not consider the predisposition of the defendant to commit the offense charged, because if the governmental involvement through its informer reached the point that I have just defined in your own minds, then the predisposition of the defendant would not matter." Brief for Petitioner 9.

The trial court refused the instruction and petitioner was found guilty. He appealed to the United States Court of Appeals for the Eighth Circuit, claiming that if the jury had believed that the drug was supplied by Hutton he should have been acquitted. The Court of Appeals rejected this argument and affirmed the conviction, relying on our opinion in *United States* v. *Russell*, 411 U. S. 423 (1973). 507 F. 2d 832 (1974).

## II

In *Russell* we held that the statutory defense of entrapment was not available where it was conceded that a Government agent supplied a necessary ingredient in the manufacture of an illicit drug. We reaffirmed the principle of *Sorrells* v. *United States*, 287 U. S. 435 (1932), and *Sherman* v. *United States*, 356 U. S. 369 (1958), that the entrapment defense "focus[es] on the intent or predisposition of the defendant to commit the crime," *Russell, supra*, at 429, rather than upon the conduct of the Government's agents. We ruled out the possibility that the defense of entrapment could ever be

based upon governmental misconduct in a case, such as this one, where the predisposition of the defendant to commit the crime was established.

In holding that "[i]t is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play," 411 U. S., at 436, we, of course, rejected the contrary view of the dissents in that case and the concurrences in *Sorrells* and *Sherman*. In view of these holdings, petitioner correctly recognizes that his case does not qualify as one involving "entrapment" at all. He instead relies on the language in *Russell* that "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, cf. *Rochin* v. *California,* 342 U. S. 165 (1952) . . . ." 411 U. S., at 431–432.

In urging that this case involves a violation of his due process rights, petitioner misapprehends the meaning of the quoted language in *Russell, supra*. Admittedly petitioner's case is different from Russell's but the difference is one of degree, not of kind. In *Russell* the ingredient supplied by the Government agent was a legal drug which the defendants demonstrably could have obtained from other sources besides the Government. Here the drug which the Government informant allegedly supplied to petitioner both was illegal and constituted the *corpus delicti* for the sale of which the petitioner was convicted. The Government obviously played a more significant role in enabling petitioner to sell contraband in this case than it did in *Russell*.

But in each case the Government agents were acting in concert with the defendant, and in each case either the jury found or the defendant conceded that he was

predisposed to commit the crime for which he was convicted. The remedy of the criminal defendant with respect to the acts of Government agents, which, far from being resisted, are encouraged by him, lies solely in the defense of entrapment. But, as noted, petitioner's conceded predisposition rendered this defense unavailable to him.

To sustain petitioner's contention here wo ld run directly contrary to our statement in *Russell* that the defense of entrapment is not intended "to give the federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it did not approve. The execution of the federal laws under our Constitution is confided primarily to the Executive Branch of the Government, subject to applicable constitutional and statutory limitations and to judicially fashioned rules to enforce those limitations." 411 U. S., at 435.

The limitations of the Due Process Clause of the Fifth Amendment come into play only when the Government activity in question violates some protected right of the *defendant*. Here, as we have noted, the police, the Government informant, and the defendant acted in concert with one another. If the result of the governmental activity is to "implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission . . . ," *Sorrells, supra,* at 442, the defendant is protected by the defense of entrapment. If the police engage in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the police under the applicable provisions of state or federal law. See *O'Shea* v. *Littleton,* 414 U. S. 488, 503 (1974); *Imbler* v. *Pachtman,* 424 U. S. 409, 428–429 (1976). But the police conduct here no more deprived defendant of any right

secured to him by the United States Constitution than did the police conduct in *Russell* deprive Russell of any rights.

*Affirmed.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE POWELL, with whom MR. JUSTICE BLACK-MUN joins, concurring in the judgment.

Petitioner, Charles Hampton, contends that the Government's supplying of contraband to one later prosecuted for trafficking in contraband constitutes a *per se* denial of due process. As I do not accept this proposition, I concur in the judgment of the Court and much of the plurality opinion directed specifically to Hampton's contention. I am not able to join the remainder of the plurality opinion, as it would unnecessarily reach and decide difficult questions not before us.

In *United States* v. *Russell,* 411 U. S. 423, 431 (1973), we noted that significant "difficulties [attend] the notion that due process of law can be embodied in fixed rules." See *Rochin* v. *California,* 342 U. S. 165, 173 (1952); cf. *Sherman* v. *United States,* 356 U. S. 369, 384–385 (1958) (Frankfurter, J., concurring in result). We also recognized that the practicalities of combating the narcotics traffic frequently require law enforcement officers legitimately to supply "some item of value that the drug ring requires." 411 U. S., at 432. Accordingly, we held that due process does not necessarily foreclose reliance on such investigative techniques. Hampton would distinguish *Russell* on the ground that here contraband itself was supplied by the Government, while the phenyl-2-propanone supplied in *Russell* was not contraband. Given the

characteristics of phenyl-2-propanone,[1] this is a distinction without a difference and *Russell* disposes of this case.

But the plurality opinion today does not stop there. In discussing Hampton's due process contention, it enunciates a *per se* rule:

> "[In *Russell*,] [w]e ruled out the possibility that the defense of entrapment could *ever* be based upon governmental misconduct in a case, such as this one, where the predisposition of the defendant to commit the crime was established." *Ante*, at 488–489. (Emphasis supplied.)
>
> .    .    .    .    .
>
> "The remedy of the criminal defendant with respect to the acts of Government agents, which . . . are encouraged by him, lies *solely* in the defense of entrapment." *Ante*, at 490. (Emphasis supplied.)

The plurality thus says that the concept of fundamental fairness inherent in the guarantee of due process would never prevent the conviction of a predisposed defendant, regardless of the outrageousness of police behavior in light of the surrounding circumstances.

I do not understand *Russell* or earlier cases delineating the predisposition-focused defense of entrapment [2] to have

---

[1] Although phenyl-2-propanone is not contraband, it is useful only in the manufacture of methamphetamine ("speed"), the contraband involved in *Russell*. Further, it is an essential ingredient in that manufacturing process and is very difficult to obtain. *United States v. Russell*, 411 U. S. 423, 425–427 (1973); *id.*, at 447 (STEWART, J., dissenting).

[2] I agree with the plurality that *Russell* definitively construed the defense of "entrapment" to be focused on the question of predisposition. "Entrapment" should now be employed as a term of art limited to that concept. See *ante*, at 488–489. This does not mean, however, that the defense of entrapment necessarily is the only doctrine relevant to cases in which the Government has encouraged or otherwise acted in concert with the defendant.

gone so far, and there was no need for them to do so. In those cases the Court was confronted with specific claims of police "overinvolvement" in criminal activity involving contraband. Disposition of those claims did not require the Court to consider whether overinvolvement of Government agents in contraband offenses could ever reach such proportions as to bar conviction of a predisposed defendant as a matter of due process.[3] Nor have we had occasion yet to confront Government overinvolvement in areas outside the realm of contraband offenses. Cf. *United States* v. *Archer*, 486 F. 2d 670 (CA2 1973). In these circumstances, I am unwilling to conclude that an analysis other than one limited to predisposition would never be appropriate under due process principles.[4]

The plurality's use of the "chancellor's foot" passage from *Russell*, *ante*, at 490, may suggest that it also would foreclose reliance on our supervisory power to bar conviction of a predisposed defendant because of outrageous police conduct. Again, I do not understand *Russell* to

---

[3] The entrapment defense was first recognized in the context of simple solicitation of an individual to sell contraband. See, *e. g.*, *Sherman* v. *United States*, 356 U. S. 369 (1958); *Sorrells* v. *United States*, 287 U. S. 435 (1932). In *Russell* and in this case, however, we have been confronted with the Government's supplying of contraband in the course of an investigation. Official involvement in contraband offenses has reached more intensive levels than those revealed in this Court's cases. See *Greene* v. *United States*, 454 F. 2d 783 (CA9 1971).

[4] Judge Friendly recently expressed the view:

"[T]here is certainly a [constitutional] limit to allowing governmental involvement in crime. It would be unthinkable, for example, to permit government agents to instigate robberies and beatings merely to gather evidence to convict other members of a gang of hoodlums. Governmental 'investigation' involving participation in activities that result in injury to the rights of its citizens is a course that courts should be extremely reluctant to sanction." *United States* v. *Archer*, 486 F. 2d, at 676–677 (footnote omitted).

have gone so far. There we indicated only that we should be extremely reluctant to invoke the supervisory power in cases of this kind because that power does not give the "federal judiciary a 'chancellor's foot' veto over law enforcement practices of which it [does] not approve." 411 U. S., at 435, quoted *ante,* at 490.

I am not unmindful of the doctrinal [5] and practical [6]

---

[5] The plurality finds no source for a doctrine limiting police involvement in crime. *Ante,* at 490–491; cf. *United States* v. *Russell,* 411 U. S., at 430–431. While such a conclusion ultimately might be reached in an appropriate case, we should not disregard lightly Mr. Justice Frankfurter's view that there is a responsibility "necessarily in [the Court's] keeping . . . to accommodate the dangers of over-zealous law enforcement and civilized methods adequate to counter the ingenuity of modern criminals." *Sherman* v. *United States, supra,* at 381 (concurring in result). In another context Mr. Justice Frankfurter warned that exclusive focus on predisposition creates the risk that the Court will "shirk" the responsibility that he perceived. *Ibid.*

The discussion of predisposition, for example, often seems to overlook the fact that there may be widely varying degrees of criminal involvement. Taking the narcotics traffic as an example, those who distribute narcotics—the "pushers"—are the persons who, next to those who import or manufacture, merit most the full sanction of the criminal law. Yet, the criminal involvement of pushers varies widely. The hardcore professional, in the "business" on a large scale and for years, is to be contrasted with the high-school youth whose "pushing" is limited to a few of his classmates over a short span of time. Predisposition could be proved against both types of offenders, and under the flat rule enunciated today by the plurality the differences between the circumstances would be irrelevant despite the most outrageous conduct conceivable by Government agents relative to the circumstances. A fair system of justice normally should eschew unbending rules that foreclose, in their application, all judicial discretion.

[6] I recognize that, if limitations on police involvement are appropriate in particular situations, defining such limits will be difficult. But these difficulties do not themselves justify the plurality's absolute rule. Due process in essence means fundamental fairness, and the Court's cases are replete with examples of judgments as to when

difficulties of delineating limits to police involvement in crime that do not focus on predisposition, as Government participation ordinarily will be fully justified in society's "war with the criminal classes." *Sorrells* v. *United States*, 287 U. S. 435, 453 (1932) (opinion of Roberts, J.). This undoubtedly is the concern that prompts the plurality to embrace an absolute rule. But we left these questions open in *Russell*, and this case is controlled completely by *Russell*. I therefore am unwilling to join the plurality in concluding that, no matter what the circumstances, neither due process principles nor our supervisory power could support a bar to conviction in any case where the Government is able to prove predisposition.[7]

MR. JUSTICE BRENNAN, with whom MR. JUSTICE STEWART and MR. JUSTICE MARSHALL concur, dissenting.

I joined my Brother STEWART's dissent in *United*

---

such fairness has been denied an accused in light of all the circumstances. See, *e. g.*, *Rochin* v. *California*, 342 U. S. 165 (1952); *Ham* v. *South Carolina*, 409 U. S. 524 (1973). The fact that there is sometimes no sharply defined standard against which to make these judgments is not itself a sufficient reason to deny the federal judiciary's power to make them when warranted by the circumstances. *Rochin* v. *California, supra*, at 169–172. Much the same is true of analysis under our supervisory power. Nor do I despair of our ability in an appropriate case to identify appropriate standards for police practices without relying on the "chancellor's" "fastidious squeamishness or private sentimentalism." *Id.*, at 172; see *Sherman* v. *United States, supra*, at 384–385 (Frankfurter, J., concurring in result); cf. *Rochin* v. *California, supra*, at 172.

[7] I emphasize that the cases, if any, in which proof of predisposition is not dispositive will be rare. Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction. This would be especially difficult to show with respect to contraband offenses, which are so difficult to detect in the absence of undercover Government involvement. One cannot easily exaggerate the problems confronted by law enforcement au-

*States* v. *Russell,* 411 U. S. 423, 439 (1973), and Mr. Justice Frankfurter's opinion concurring in the result in *Sherman* v. *United States,* 356 U. S. 369, 378 (1958). Those opinions and the separate opinion of Mr. Justice Roberts in *Sorrells* v. *United States,* 287 U. S. 435, 453 (1932), express the view, with which I fully agree, that "courts refuse to convict an entrapped defendant, not because his conduct falls outside the proscription of the statute, but because, even if his guilt be admitted, the methods employed on behalf of the Government to bring about conviction cannot be countenanced." 356 U. S., at 380. The "subjective" approach to the defense of entrapment—followed by the Court today and in *Sorrells, Sherman,* and *Russell*—focuses on the conduct and propensities of the particular defendant in each case and, in the absence of a conclusive showing, permits the jury to determine as a question of fact the defendant's "predisposition" to the crime.[1]  The focus of the view

thorities in dealing effectively with an expanding narcotics traffic, cf. *United States* v. *Russell, supra,* at 432; L. Tiffany, D. McIntyre, & D. Rotenberg, Detection of Crime 263–264 (1967), which is one of the major contributing causes of escalating crime in our cities. See President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 221–222 (1967). Enforcement officials therefore must be allowed flexibility adequate to counter effectively such criminal activity.

[1] While the Court has rejected any view of entrapment that does not focus on predisposition, a reasonable alternative inquiry might be whether the accused would have obtained the contraband from a source other than the Government. This factor could be brought into the case through the jury charge. Once the accused comes forward with evidence that the Government is the supplier, the prosecution would bear the burden of proving beyond a reasonable doubt either (1) that the Government is not the supplier or (2) that the defendant would have obtained the contraband elsewhere to complete the transaction. Cf. *United States* v. *West,* 511 F. 2d 1083, 1086 (CA3 1975); *United States* v. *Bueno,* 447 F. 2d 903 (CA5 1971).

espoused by Mr. Justice Roberts, Mr. Justice Frank-furter, and my Brother STEWART "is not on the propensi-ties and predisposition of a specific defendant, but on 'whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power.'. . . Under this approach, the determination of the lawful-ness of the Government's conduct must be made—as it is on all questions involving the legality of law enforce-ment methods—by the trial judge, not the jury." 411 U. S., at 441. Petitioner's claims in this case allege a course of police conduct that, under this view, would plainly be held to constitute entrapment as a matter of law.

In any event, I think that reversal of petitioner's con-viction is also compelled for those who follow the "sub-jective" approach to the defense of entrapment. As MR. JUSTICE REHNQUIST notes, the Government's role in the criminal activity involved in this case was more pervasive than the Government involvement in *Russell*. *Ante*, at 489. In addition, I agree with MR. JUSTICE POWELL that *Russell* does not foreclose imposition of a bar to convic-tion—based upon our supervisory power or due process principles—where the conduct of law enforcement au-thorities is sufficiently offensive, even though the indi-viduals entitled to invoke such a defense might be "pre-disposed." *Ante*, at 495. In my view, the police activity in this case was beyond permissible limits.

Two facts significantly distinguish this case from *Russell*. First, the chemical supplied in that case was not contraband. It is legal to possess and sell phenyl-2-propanone and, although the Government there supplied an ingredient that was essential to the manufacture of methamphetamine, it did not supply the contraband itself. In contrast, petitioner claims that the very nar-

cotic he is accused of selling was supplied by an agent of the Government. Compare *ante,* at 489, with *ante,* at 491–492.

Second, the defendant in *Russell* "was an active participant in an illegal drug manufacturing enterprise which began before the Government agent appeared on the scene, and continued after the Government agent had left the scene." 411 U. S., at 436. Russell was charged with unlawfully manufacturing and processing methamphetamine, *id.,* at 424, and his crime was participation in an ongoing operation. In contrast, the two sales for which petitioner was convicted were allegedly instigated by Government agents and completed by the Government's purchase. The beginning and end of this crime thus coincided exactly with the Government's entry into and withdrawal from the criminal activity involved in this case, while the Government was not similarly involved in Russell's crime. See *Greene* v. *United States,* 454 F. 2d 783 (CA9 1971).

Whether the differences from the *Russell* situation are of degree or of kind, *ante,* at 489, I think they clearly require a different result. Where the Government's agent deliberately sets up the accused by supplying him with contraband and then bringing him to another agent as a potential purchaser, the Government's role has passed the point of toleration. *United States* v. *West,* 511 F. 2d 1083 (CA3 1975). The Government is doing nothing less than buying contraband from itself through an intermediary and jailing the intermediary. *United States* v. *Bueno,* 447 F. 2d 903, 905 (CA5 1971). There is little, if any, law enforcement interest promoted by such conduct; plainly it is not designed to discover ongoing drug traffic. Rather, such conduct deliberately entices an individual to commit a crime. That the accused is "predisposed" cannot possibly justify the action of government officials in purposefully creating

the crime. No one would suggest that the police could round up and jail all "predisposed" individuals, yet that is precisely what set-ups like the instant one are intended to accomplish. Cf. *United States* v. *Russell,* 411 U. S., at 443–444 (STEWART, J., dissenting). Thus, this case is nothing less than an instance of "the Government . . . seeking to punish for an alleged offense which is the product of the creative activity of its own officials." *Sorrells* v. *United States,* 287 U. S., at 451.

These considerations persuaded the Court of Appeals for the Fifth Circuit to hold that where the Government has provided the contraband that the defendant is convicted of selling, there is entrapment as a matter of law. *United States* v. *Bueno, supra.* That court has also concluded that this holding was not affected by *Russell.* See, e. g., *United States* v. *Oquendo,* 490 F. 2d 161 (1974); *United States* v. *Mosley,* 496 F. 2d 1012 (1974). The Court of Appeals for the Third Circuit agreed, and followed *Bueno* after *Russell* was decided.[2] *United States* v. *West, supra.* Even if these courts erred in holding that *Russell* did not foreclose the finding of "entrapment" as a matter of law in *Bueno,* see *ante,* at 492 n. 2, I agree with my Brother POWELL that "entrapment" under the "subjective" approach is only one possible defense—he suggests due process or appeal to our supervisory power as alternatives—in cases where the Government's conduct is as egregious as in this case. *Ante,* at 493–495.[3]

---

[2] The Court of Appeals for the Seventh Circuit also followed *Bueno* in *United States* v. *McGrath,* 468 F. 2d 1027 (1972). This Court remanded that case for reconsideration in light of *Russell,* 412 U. S. 936 (1973), and the Court of Appeals apparently concluded that *Bueno* did not survive *Russell. United States* v. *McGrath,* 494 F. 2d 562 (1974).

[3] It might be suggested that the police must on occasion supply contraband to catch participants in drug traffic, but this justification is unconvincing. If the police believe an individual is a distributor of narcotics, all that is required is to set up a "buy"; the putative

Petitioner makes no claim to the benefit of an entrapment defense that focuses on predisposition. *Ante,* at 489. For the reasons stated I would at a minimum engraft the *Bueno* principle upon that defense and hold that conviction is barred as a matter of law where the subject of the criminal charge is the sale of contraband provided to the defendant by a Government agent.[4] Cf. *Olmstead* v. *United States,* 277 U. S. 438, 470 (1928) (Holmes, J., dissenting); *Casey* v. *United States,* 276 U. S. 413, 423–425 (1928) (Brandeis, J., dissenting).

---

pusher is worth the investigative effort only if he has ready access to a supply. See *United States* v. *Russell,* 411 U. S., at 448–449 (STEWART, J., dissenting).

[4] For present purposes it would be sufficient to adopt this rule under our supervisory power and leave to another day whether it ought to be made applicable to the States under the Due Process Clause. In addition to the authorities cited in *Russell, supra,* at 445 n. 3 (STEWART, J., dissenting), some state courts have adopted the objective approach. See, *e. g., State* v. *Mullen,* 216 N. W. 2d 375 (Iowa 1974); *People* v. *Turner,* 390 Mich. 7, 210 N. W. 2d 336 (1973); *Lynn* v. *State,* 505 P. 2d 1337 (Okla. 1973).