**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Hector Ricardo PICO–ZAZUETA, Defendant-Appellant.**

**No. 77–1562.**

United States Court of Appeals, Ninth Circuit.

Nov. 28, 1977.

Rehearing and Rehearing En Banc Denied Jan. 20, 1978.

Joseph A. Milchen, San Diego, Cal., argued for defendant-appellant.

Sandra J. Wittman, Asst. U. S. Atty. (argued), on the brief, Terry J. Knoepp, U.S. Atty., San Diego, Cal., for plaintiff-appellee.

Before BROWNING and GOODWIN, Circuit Judges, and JAMESON,* District Judge.

JAMESON, District Judge:

Hector Ricardo Pico-Zazueta (Pico) has appealed from a judgment of conviction, following a jury trial, of conspiracy to possess and possession with intent to distribute a controlled substance (cocaine), in violation of 21 U.S.C. §§ 841(a)(1) and 846. He contends that the court failed to give the jury proper instructions on the issue of entrapment.

Juan Armando Alvarez-Mendivil (Alvarez) and Cesar Martinez-Meza (Martinez) were charged as co-defendants. Each pleaded guilty and appeared as a witness for the Government in the case against Pico.

In March, 1976, Gonzalo Marquez, also known as Rudy Lopez, a government informant, traveled from Texas to Calexico, California, where he first met Alvarez. A few days later, in response to questioning as to what he was doing in Calexico, Marquez replied that he was looking for a kilo of cocaine. Marquez returned to Texas the following day, after exchanging telephone numbers with Alvarez.

Pico, the only witness for the defense, testified that he and Alvarez were friends, and that Alvarez approached him with the suggestion of selling cocaine to a man named Rudy Lopez, whom Alvarez had met in Calexico. Pico admitted he was receptive to making a deal. There is a conflict in the evidence with respect to the subsequent negotiations, particularly with reference to what was said regarding the place of sale. Pico testified that he told Marquez "many

times" that he would not deal in the United States, but only in Mexico, and that Marquez kept insisting that the deal be made in the United States.

On July 8, 1976, Marquez, who was then in Texas, received a phone call from Alvarez, and arrangements were were made for Marquez to meet Alvarez in San Diego for a cocaine sale. Marquez testified that he arrived in San Diego on July 11, where he was met at the airport by Drug Enforcement Agents, and later by Alvarez. Alvarez drove Marquez to Tijuana, Mexico, where they met with Pico. They discussed the sale of a pound of cocaine from Pico to Marquez for the sum of $1,500 per ounce, and Pico supplied Marquez with a gram as a sample.[1] Pico told Marquez the cocaine was on its way to Tijuana and that he wanted the sale to take place in Tijuana. Marquez replied that he would deal only in the United States. Pico then stated that he would have to call his people and that Marquez should contact him the following day at a number in the United States.[2]

According to Marquez, he phoned Pico the next day, July 12, at the number Pico had given him, and Pico agreed to meet Marquez at the bar of the Royal Inn in San Diego. They met at the bar, with a female undercover agent, who produced $50,000, ostensibly to be used in purchasing the cocaine. Marquez and Pico discussed the details of the sale, which was to take place the next day in San Diego.[3]

The following day, July 13, Pico phoned Marquez[4] and said that the cocaine had not arrived and he was bringing Marquez a sample of cocaine from another connection. Later Pico delivered the sample to Marquez

---

* Honorable William J. Jameson, Senior District Judge for the District of Montana, sitting by designation.

1. Pico testified, however, that he did not give the sample to Marquez, but rather to Alvarez, who in turn gave it to Marquez; that he (Pico) was "helping Alvarez".

2. Marquez testified on cross-examination
 "Q. All right. It was clear to you, I take it, that Pico wanted to deal in Mexico?
 A. No, he never said; no, he never said: 'No, we're going to deal in Tijuana or

nothing.' When I told him that I didn't like this plan, that the only way I would deal would be here in San Diego, that's when he give me his number, said he would have to call his people, or me to call him the following day."

3. Pico testified that he told Marquez he could not deal in San Diego.

4. According to Pico, this was in response to a message from Marquez to call.

in Marquez's motel room and told him the delivery would be made that afternoon. That evening Marquez called Pico and told Pico that he couldn't wait any longer, that he had to go back to Texas, and that when Pico obtained the cocaine, to call him and he would return to San Diego.

Pico testified that when he first met Marquez on July 11 he told Marquez that the sale had to be made in Tijuana, that he didn't want to do anything in the United States because he already had "some problems" with his brother.[5] When he met Marquez at Marquez' motel room on July 13, Marquez showed Pico some cocaine he had ostensibly purchased from another dealer, and asked Pico if he was interested in dealing. Pico said he couldn't do it there and the best place to deal was in Tijuana. He accused Marquez of being a "cop" because Marquez always "tried to squeeze" him. Pico left, but Marquez called again to try to arrange the purchase. Pico refused and Marquez left town. Marquez called him three more times from Texas and each time Pico refused to deal, telling Marquez that Marquez was working for the Government.

Pico testified further that after the calls from Marquez, he told Alvarez and Martinez not to deal with Marquez because he was either a cop or working for the cops; that Alvarez asked Pico to work with him in dealing with Marquez in the United States but Pico refused.

On August 24, 1976, Alvarez telephoned Marquez at Dallas, Texas, and told him arrangements for the cocaine sale were made and the sale would take place in Calexico, California on August 26. The evening of August 25 Pico and Martinez took the cocaine to Alvarez' residence in Calexico and spent the night with Alvarez. The next morning Pico was observed in Calexico.

Marquez arrived in El Centro, California on August 26 and telephoned Alvarez to meet him in El Centro rather than Calexico. Alvarez agreed and arrived approximately 45 minutes later, bringing with him samples of cocaine. Alvarez and Marquez then obtained the remainder of the cocaine from Alvarez' car and while returning to the hotel room, Alvarez was placed under arrest.

For approximately 30 minutes prior to the arrest of Alvarez, Pico was observed across the street from the motel where the sale took place, looking in the direction the vehicle Alvarez arrived in had taken. Alvarez testified that Pico had gone across the street saying that "there was no sense . . . all three of us—no sense for all three of us to get arrested"; and that Pico promised Alvarez help if there were any problem and if there were an arrest.

Pico was later arrested on October 30 as he entered into the United States at San Ysidro, California from Mexico.

Pico admitted that he accompanied Martinez and Alvarez to Calexico on August 25 and stayed at Alvarez' house, and that he proceeded from there to El Centro where the deal was made. He claimed, however, that he was on his way to Mexicali to visit his brother and denied any involvement in the narcotics deal. He testified that the brief case containing the cocaine was in Martinez' possession most of the time and that he was pressured by Martinez to accompany Martinez and Alvarez to El Centro.[6]

■ Appellant contends the district court erred in (1) "giving prejudicial jury instructions that failed to specifically refer to the government's burden of proof beyond a reasonable doubt"; and (2) in failing "to give a

---

5. Pico testified that his stepfather and brother had both been convicted and served time in federal institutions in the United States for the sale of narcotics, and that his brother was currently wanted for jumping bail on a narcotics charge.

6. Pico testified that he had never sold cocaine to anyone. He denied that he was to receive any money from the transaction or that he had promised Alvarez help if Alvarez were arrested. Rather he claimed he told Martinez he didn't want to have anything to do with the deal or to go to El Centro, but that Martinez said he had to go along, but that they would let him off before they went to the motel.

specialized entrapment jury instruction as required by *Carbajal-Portillo v. United States*, 396 F.2d 944 (9 Cir. 1968)".

We find no merit in the first contention.[7] The instruction given, as noted by the district court, was identical to that approved by this court in *United States v. Reynoso-Ulloa* and *Mummert*, 548 F.2d 1329 (1977). Moreover, counsel for appellant made no objection to the instruction, but rather advised the court that he had no objection to the instructions given. His objection was limited to the failure to give the *Carbajal* instruction. See *Esposito v. United States*, 436 F.2d 603 (9 Cir. 1970).

 It is appellant's second contention that the district court erred in refusing to give two offered instructions,[8] which he argues were required by the holding of this court in *Carbajal-Portillo v. United States, supra.* In declining to give the instructions

the district court noted that no instruction on entrapment was given in *Carbajal* and concluded that the instruction taken from *United States v. Mummert* (Note 7) was adequate to cover the point raised in *Carbajal.*

It is true, as both parties recognize, that no entrapment instruction was given in *Carbajal.* Rather the court held that there was entrapment as a matter of law. It was undisputed that Carbajal made a sale of heroin to Ricos, a narcotics agent, in the United States when Ricos refused to go to Mexico to complete the deal, telling Carbajal he was on parole and the sale would have to be made in the United States.[9] It was conceded in argument on appeal "that Carbajal would not have brought the narcotics into the United States but for the importuning of Ricos, the narcotics agent". The court concluded that it was "uncontro-

---

7. The instruction on entrapment reads:

"Where an otherwise innocent person, with no previous intent or purpose to violate the narcotics laws, is induced or persuaded by law enforcement officers or their agents to commit a crime, he is the victim of entrapment and the law, as a matter of policy, forbids his conviction in such a case.

"On the other hand, where a person already has the predisposition, that is, the readiness and willingness to break the narcotics laws, the mere fact that a Government agent provided what appears to be a favorable opportunity, is not entrapment.

"If, then, the jury should find beyond a reasonable doubt from the evidence in the case that before anything at all occurred respecting the alleged offense involved in this case, the defendant was ready and willing to commit the crimes as charged in the indictment, whenever opportunity was afforded, and the Government officers or their agents did no more than offer the opportunity, then the jury should find that the defendant was not a victim of entrapment.

"On the other hand, if the evidence in the case should leave you with a reasonable doubt whether the defendant had the previous intent or purpose to commit any offense of the character here charged, and did so only because he was induced or persuaded by some officer or agent of the Government, then it is your duty to acquit him.

"The terms 'inducement or persuasion,' in the law of entrapment, may include the promise or other economic benefit.

"Law enforcement officers are entitled to infiltrate groups of persons whom they know are suspect to be involved in criminal activi-

ty. There is nothing unlawful or improper in doing that. The law, however, does not permit Government agents to originate or implant the criminal design in a defendant's mind."

8. The instructions offered by appellant read:

If the jury should find from the evidence that defendant Hector Pico was willing to engage in a cocaine transaction in Mexico, and that he was reluctant to commit any act relating to the transaction in the United States, and that reluctance was overcome by the affirmative persuasion and importuning of the informant Gonzalo Marquez, such conduct by the government constitutes entrapment and cannot lawfully form the basis for a prosecution. (Defendant's offered instruction No. 2.)

If the jury should find from the evidence in this case that Hector Pico was initially reluctant to commit any act in the United States, and that he would not have done so except for the persuasion, deceitful representation and inducement by Gonzalo Marquez, such conduct constitutes entrapment and cannot lawfully form the basis for a prosecution. (Defendant's offered instruction No. 3.)

9. Carbajal was a resident of Mexico, "where he had a family to support and was unemployed and destitute". He was offered $500.00 to carry a package of heroin to Mexicali, a city in Mexico adjoined to the border. The prospective purchaser told Carbajal he was unable to pay for the heroin and suggested that Carbajal go across the border and sell the heroin to Ricos.

verted that Carbajal initially was reluctant to commit these crimes (importation and sale of heroin), and that he would not have done so except for the persuasion, deceitful representation and inducement by Ricos" (396 F.2d at 946); and that "the agent affirmatively persuaded Carbajal to commit the crime in order that he might arrest him".[10] *Id.* at 947.

This case is factually distinguishable. Pico, Alvarez and Marquez initially met in Tijuana, Mexico on July 11,[11] when they discussed the sale of cocaine to Marquez. Pico furnished a sample. While he testified that he was "helping Alvarez" and gave the sample to Alvarez, who in turn gave it to Marquez (in Pico's presence), he admitted that on any sale he would furnish the cocaine.[12]

It is undisputed that following this meeting, Pico went to San Diego twice, on July 12 and 13, and met Marquez at Marquez' hotel—the first time in the hotel bar and the second time in Marquez' room—and that on both occasions they discussed the cocaine transaction. Pico testified that by the time of the second meeting he had determined in his own mind that Marquez was working for the Government and accused Marquez of being a "cop". Pico testified further that Marquez called him three times after July 13. He did not recall the dates of those calls, but it is apparent from his testimony that the last call was at least three weeks prior to the sale.[13] Sometime subsequent to July 13 Pico warned Alvarez and Martinez that Marquez was a cop.

It is also undisputed that the negotiations on August 24 and 25 and the sale on August 26 were between Alvarez and Marquez. There is no evidence of any contact between Pico and Marquez at or near the time of sale. Pico denied any involvement in the sale itself.

There is no evidence of any importuning of Pico by Marquez at the time of the sale.[14] Nor is there any evidence that Pico was induced to go to Calexico and El Centro by Marquez. Rather Pico claims he was induced to go by Martinez, one of his co-defendants. Under Pico's own testimony his resolve to deal only in Mexico was unimpaired after his last contact with Marquez, and any pressure at the time of the sale came from the co-defendants, Alvarez and Martinez.

In essence appellant contends that (1) he was in no way involved in the narcotics sale; (2) he never sold cocaine to anyone; (3) when he accompanied the co-defendants to Calexico he was on his way to visit a brother in Mexicali; and (4) he told the Government agent that the agent was a "cop" and warned his co-defendants that the agent was a cop; but (5) if his testimony with respect to his non-participation in the offense was false, then he was a victim of entrapment in that his "reluctance was overcome by the affirmative persuasion and importuning" by Marquez and that he would not have committed the offense "except for the persuasion, deceitful representation and inducement" by Marquez.

10. It may be noted also that in *Carbajal*, the conviction of a co-defendant, Vega, was affirmed. Vega agreed to help Carbajal with the delivery "as an accommodation for his new-found friend", and the court concluded that his willingness to do so was "in no way affected by the circumstances under which Carbajal had agreed to make the sale". The court recognized that any "inducement" of Vega was made by Carbajal and noted, "To give Vega the benefit of Carbajal's entrapment on this record would be to make such a defense available not only to those induced into crime by the principal actor but to professional criminals as well."

11. The initial contact between Alvarez and Marquez was sometime in March. Between then and July 8 Pico and Alvarez had discussed a possible sale of cocaine to Marquez.

12. Pico admitted also that he knew Marquez was from the United States and that he intended to supply Marquez with a much larger quantity of cocaine.

13. In testimony about a conversation with Alvarez and one Gonzales "about three weeks before Alvarez and Martinez got arrested", Pico stated that he had a call from Marquez about two days before, that he told Marquez not to call him again, and didn't "hear any more from him".

14. Apparently Pico decided to take a chance and cooperate with co-defendants Alvarez and Martinez in making the sale, with the co-defendants acting as front men and Pico remaining in the background.

Appellant's proffered instructions paraphrased language in *Carbajal* and decisions therein quoted in requesting the court to instruct the jury that if the jury should find that Pico was willing to engage in a cocaine transaction in Mexico but was "reluctant to commit any act relating to the transaction in the United States, and that reluctance was overcome by the affirmative persuasion and importuning of the informant Gonzalo Marquez" or if Pico "was initially reluctant to commit any act in the United States, and that he would not have done so except for the persuasion, deceitful representation and inducement by Gonzalo Marquez", such conduct by the Government constituted entrapment. The jury was of course instructed that if the evidence left "a reasonable doubt whether the defendant had the previous intent or purpose to commit any offense of the character here charged, and did so only because he was induced or persuaded by some officer or agent of the Government," then it was the jury's duty to acquit him.[15]

When *Carbajal* was decided, a defendant who denied that he committed the offense could not invoke the defense of entrapment. Under the subsequent decision of this court in *United States v. Demma*, 523 F.2d 981 (9 Cir. 1975), a defendant may assert entrapment without conceding that he committed the offense. The following language in *Demma* is pertinent:

> Of course, it is very unlikely that the defendant will be able to prove entrapment without testifying, and, in the course of testifying, without admitting that he did the acts charged. . . . Inconsistent testimony by the defendant seriously impairs and potentially destroys his credibility. While we hold that a defendant may both deny the acts and

other elements necessary to constitute the crime charged and at the same time claim entrapment, the high risks to him make it unlikely as a strategic matter that he will choose to do so. 523 F.2d at 985.

Here Pico decided to take the "high risk" of testifying and denying that he committed the offense, with the resulting inconsistencies and lack of credibility suggested in *Demma*. There is no question that Pico was willing to sell cocaine to Marquez if the sale could be consummated in Mexico. He negotiated freely in the United States. Under his own testimony he remained convinced Marquez was a "cop", Marquez did not communicate with him for at least three weeks prior to the sale, and Pico did not participate in the sale. If there were in fact any "opporturning" or "inducement", it came from the co-defendants, and not from Marquez. Pico's testimony is inconsistent with any entrapment at the time of sale. We are not persuaded that the rule of *Carbajal*, where the commission of the offense and Government inducement were admitted, should be extended to the facts of this case.

■ Two cases decided by the Supreme Court subsequent to *Carbajal-United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973) and *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), have emphasized that "entrapment is a relatively limited defense". In *Russell* the Court noted the holding in *Sherman v. United States*, 356 U.S. 369, 372, 78 S.Ct. 819, 2 L.Ed.2d 848, that "to determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal". 411 U.S. at 429, 93 S.Ct. at 1641.[16] It is clear

---

**15.** On the basis of this instruction defense counsel in closing argument, in an extended discussion of entrapment, argued, without objection, that the "entrapment, in this case, goes not to matters in Mexico, but to matters in the United States, because even if you are predisposed to commit crimes in Mexico, the question is: Was he disposed to commit crimes in the United States". We recognize that this would not in itself avoid the well established rule that refusal to instruct the jury on the

defendant's theory of the case is reversible error, if the proffered instructions were in fact required under the evidence.

**16.** The Court continued: "It is rooted, not in any authority of the Judicial Branch to dismiss prosecutions for what it feels to have been 'overzealous law enforcement', but instead in the notion that Congress could not have intended criminal punishment for a defendant who

that the defense of entrapment is available only when the result of governmental activity is to "implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission". *Hampton v. United States, supra,* 425 U.S. at 490, 96 S.Ct. at 1650.

As in *Russell, supra,* Pico was not an "unwary·innocent", but an "unwary criminal".

Affirmed.

has committed all the elements of a proscribed offense, but was induced to commit them by the Government." 411 U.S. at 435, 93 S.Ct. at 1644.