673 P.2d 416

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Voyne Edwin HANSEN,
Defendant-Appellant.**

**No. 14680.**

Supreme Court of Idaho.

Dec. 8, 1983.

Gaylen L. Box and Dennis W. Olley, Office of The Public Defender, Pocatello, for appellant.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Boise, for appellee.

HUNTLEY, Justice.

The sole issue presented on appeal is whether the jury was adequately and properly instructed on the law of entrapment under the circumstances of this case.

Initially there were two instructions on the law of entrapment. The jury deliberated four and one-half hours, and then requested and was given a third instruction further explaining the law of entrapment. Eleven minutes later the jury returned a guilty verdict.

The three instructions, considered together, correctly stated the law of entrapment.[1] Counsel for appellant urges that we speculate that the jury ignored the first two instructions, or at least gave undue emphasis to the third. There is no basis either in the record or the law for such a conjecture by this Court.

Finding no error, we affirm the judgment of the trial court. No attorney fees.

DONALDSON, C.J., and SHEPARD and BAKES, JJ., concur.

BISTLINE, Justice, dissenting.

I cannot agree with the Court's summary disposition of this case. Because I am of the opinion that there are very serious problems which the majority has not addressed—problems which require a new trial for the appellant—I will set out both the facts of this case and the applicable law which mandate a result contrary to that reached by the majority.

Perhaps not surprisingly, the version of the facts offered by the State and the appellant in this case are vastly different. However, it is clear that appellant and others were arrested on February 25, 1981, following the sale of fifty pounds of marijuana to State Narcotics agents for some $28,000 in cash. It also seems that the sale was the culmination of an investigation involving three State agents and initiated by one Pat Thomas, a paid female informer for the Idaho State Bureau of Narcotics. The appellant's allegations of entrapment stem from his relationship with Agent Thomas.

The appellant, fifty-year-old Voyne Edwin Hansen, first met Agent Thomas during late January or early February of 1981. Agent Thomas, from the very outset of her relationship with Hansen indicated a desire

---

1. INSTRUCTION NO. 12

"Entrapment exists when an otherwise innocent person, not inclined to commit a criminal offense, is induced to do so by a State agent who, desiring grounds for prosecution, originates the criminal design and implants in the mind of the innocent person the disposition to commit the alleged offense.

If you find beyond a reasonable doubt, from the evidence in the case, that before anything at all occurred regarding the alleged offense involved in this case, that the defendant was ready and willing to commit such offenses whenever opportunity was afforded, and that the State agent did no more than offer an opportunity to commit said offense, then you should find that the defendant is not a victim of entrapment.

On the other hand, if the evidence in the case should leave you with a reasonable doubt that this defendant had the previous intent or purpose to commit any offense of the character charged and did so only because he was induced or persuaded by the State agent, then it is your duty to acquit him."

INSTRUCTION NO. 13
"To establish this defense of entrapment bear in mind that the burden is on the Defendant to produce some substantial evidence that law enforcement agents or persons acting under their direction and control induced him to commit the offense. If you find the Defendant Hansen has produced such evidence then the State must prove beyond a reasonable doubt that the inducement was not the cause of the crime, that is, that the Defendant Hansen was ready and willing to commit the offense."

ADDITIONAL INSTRUCTION
"The word entrapment means an inducement or solicitation by one person to another person to commit a crime, not contemplated by the latter, for the mere purpose of instituting criminal prosecution against him. If an officer or his agent furnishes such person the opportunity to commit the crime charged, but if the person to whom the opportunity is given has either the opportunity to commit the crime charged or refuse to do so, and he chooses to commit the crime, then there is no entrapment."

818

to purchase marijuana from him. Hansen, however, informed Agent Thomas that he did not sell marijuana and was not in the marijuana business. According to Hansen's testimony, at the time he met Agent Thomas he was in a small-time pill business, which basically amounted to selling caffeine-ephedrine tablets packaged in a manner which made them appear to be amphetamines. We have been directed to no testimony indicating that Hansen, prior to his involvement with Agent Thomas, had ever been a dealer of marijuana.

Hansen met with Agent Thomas a second time. At this meeting, Agent Thomas brought marijuana with her which she and Hansen smoked together. During this second meeting, Agent Thomas once again requested Hansen to either sell her some marijuana or tell her where she could buy some. Once again, however, Hansen informed her that he was not in the business of selling marijuana and that he did not know where she could purchase any.

Apparently, through his meetings with Agent Thomas, Hansen came to learn a substantial amount about her personal situation. He learned that she had two children, a daughter, fifteen, and a son, ten, and a husband prone to violence who was presently institutionalized, though due to be released. Her husband had apparently beaten her to the point where she was severely scarred. Hansen became concerned about the poor environment which she and her children were forced to endure, and offered to have them stay with him at his home in American Falls, where they would be provided with separate quarters. Agent Thomas accepted and, after having known Hansen for approximately one week, she and her children moved in with Hansen. She remained with Hansen until the time of his arrest.

Again Agent Thomas requested Hansen to either procure marijuana for her or tell her where she could purchase some. Again, Hansen declined.

Finally, after having refused Agent Thomas' requests for marijuana "several times," Hansen relented, telling her that "if she really needed it, when I was over in Salt Lake ..., if I seen anybody that smoked, I'd ask them if they had a large quantity of marijuana to sell." Tr., p. 139. As to his motivation for purchasing the marijuana, Hansen's testimony is clear:

"A. (Mr. Hansen) Actually, I felt more sorry for the lady than anything. She was trying to raise two kids under conditions that was too bad for me to put up with.

. . . .

"A. ... And she had, by that time, convinced me of the fact that she needed money to get out of the place because her husband was due back from some institution or out of town someplace. And she told me that the man had beat her until she had scars on her back, and offered to show me. And she was afraid that he was going to come down and get her again.

. . . .

"A. ... The real reason that I did it, mainly, was on account of the kids.

. . . .

"A. ... And the 15-year-old girl and the boy shouldn't be exposed to things like this. And that's the reason that I did it. That's the reason that I went along with the deal anyway is just to get them out of there.

"I had told that woman time after time, when she was trying to buy dope from me, 'You don't have to do it. [sic]'

. . . .

"But she kept pushing the issue and pushing the issue. So I says, 'O.K. If it'll get you out of it, I'll introduce you to somebody to buy the pot from if I see anybody that's got it.'

. . . .

"A. I was just looking, because like I said, Pat [Agent Thomas] told me that her husband was coming down to beat her some more. He tried to take unfair advantage of the young girl, and everything. And I thought, well, if that's the way that she does it, that's all right with me. If I can find somebody that's got a

large quantity of marijuana, and it'll get her out of it, fine, let her go.'"

Tr., pp. 140–68.

The case was tried before a jury on March 23, 1982. After all testimony was concluded, the case was submitted to the jury at 3:55 p.m. At 8:25 p.m., after deliberating four and one-half hours, the jury sent a note informing the court that it was unable to come to a unanimous verdict. The court then questioned the respective members of the jury. One member of the jury advised the court that the jury did not understand "entrapment," stating the following:

"[Juror Lee] We don't have any guide to go by of what's normal procedure and what is abnormal procedure. We don't know what they usually do, or was that more than they usually do."

Tr., p. 182.

Whereupon, after consulting with counsel, denying defense counsel's motion for mistrial and overruling its objection to the court's proposed instruction, the trial court delivered it additional instruction on entrapment to the jury at 8:55 p.m. At 9:06 p.m., eleven minutes after the instruction was given, the jury returned with a guilty verdict. Hansen then filed this appeal, alleging that the jury was not properly and adequately instructed on the law of entrapment under the circumstances of this case.

The majority opinion states as its sole answer to Hansen's contention that the jury ultimately disregarded the court's first two instructions or gave undue emphasis to the third, that "[t]here is no basis either in the record or the law for such a conjecture by this Court." Such a response is not only cavalier, of which treatment counsel for Hansen is undeserving, but, given the state of the record, patently absurd. It does not require conjecture to conclude that, after four and one-half hours of fruitless deliberation followed by a new instruction and but eleven additional minutes of "discussion"— barely enough time to even read the additional instruction—resulting in a unanimous verdict, that it was the new instruction which definitively tilted the scale. This is not speculation or conjecture, but rather common sense and pure deductive reasoning which would be so even with attorneys of limited trial experience. To assert otherwise is to ignore the facts.

However, this alone would be insufficient if the additional instruction was itself acceptable. In considering that instruction, we are of course mindful of the general proposition that "jury instructions must be considered in their entirety, and error cannot be predicated upon a single instruction or part thereof which may be objectionable when not considered in connection with the instructions as a whole." *State v. Peterman,* 100 Idaho 269, 271, 596 P.2d 442, 444 (1979). However, the unique circumstances of the present case defy such a pat response for several reasons. First, because of the bifurcated nature of the court's presentation of its instructions to the jury, it is clear that the instructions were not given as a unit. Second, the trial court, when submitting its additional instruction to the jury, did nothing to caution the jury against considering the new instruction in isolation from the other two. Third, it is clear from the incredibly brief period the jury spent deliberating after receiving the additional instruction that it could not possibly have done anything but review that particular instruction and again vote on their belief as to Hansen's guilt or innocence. Finally, the present case provides the rare case where the jury's reasoning process is crystal clear: as to the first two instructions, both of which contained the correct direction as to the burden of proof, the jury was unable to reach a verdict; it was only the last instruction which broke the deadlock. Thus, the additional instruction must, in all fairness, be considered alone rather than in conjunction with the other instructions.

The trial court's additional instruction is clearly inadequate. The instruction provided as follows:

"The word entrapment means an inducement or solicitation by one person to another person to commit a crime, not contemplated by the latter, for the mere purpose of instituting criminal prosecu-

tion against him. If an officer or his agent furnishes such person the opportunity to commit the crime charged, but if the person to whom the opportunity is given has either the opportunity to commit the crime charged or refuse to do so, and he chooses to commit the crime, then there is no entrapment."

The instruction itself is taken from *State v. Whitlock,* 82 Idaho 540, 542, 356 P.2d 492, 493 (1960). However, the State's assertion to the contrary notwithstanding, it is clear that the instruction only made its way into the Idaho Reports because it was objected to, and that the Court in *Whitlock* in no way approved the instruction.[1] Further, the *Whitlock* instruction omits any mention of the proper allocation of the burden of proof. In the present case, that omission is the most single salient difference between the court's initial instructions, both of which contain such vital information, and the additional instruction, which does not. Because it is prejudicial error for a trial court to instruct the jury as to the defense of entrapment without also instructing as to the proper allocation of the burden of proof, *United States v. Landry,* 257 F.2d 425 (7th Cir.1958), i.e., that the State must prove beyond a reasonable doubt that no entrapment occurred once the defense has been properly raised, it is clear that the additional instruction is itself inadequate and that a new trial must be ordered.

Further, the trial court's additional instruction is incorrect as a statement of the law. In stating that, "if the person to whom the opportunity is given has either the opportunity to commit the crime charged or refuse to do so, and he chooses to commit the crime, then there is no entrapment," the instruction overlooks the principal element in the defense of entrapment—the defendant's predisposition to commit the crime. *United States v. Russell,* 411 U.S. 423, 433, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366, 374 (1973). It seems clear that, except in cases of fraud or duress, all

persons have "the opportunity to commit the crime charged or refuse to do so." Thus, by stating this as the test, the court essentially predestined the guilty verdict by setting up a straw man requirement of proof, which will always be met in the case of a guilty defendant. This defect is clearly not cured by the first sentence of the instruction, which speaks of a crime "not contemplated by the [defendant]." Whether a crime is contemplated by the defendant depends on one's time frame. Obviously, such contemplation will always be present at the time the crime occurs. In addition, many people have contemplated crimes in their lives without having acted upon such random wayward thoughts. Regardless, however, the question of entrapment turns not on whether the defendant had contemplated the commission of such a crime, but whether he was predisposed to commit the crime. *Russell, supra.* Because the court's additional instruction neglects this point, it is incorrect as a matter of law. Thus, even under the law as it currently stands in Idaho and under the federal system, the trial court's instruction was wrong and a new trial should be had, one free of such error.

However, I am also of the belief that the present standards of entrapment which prevail in this country are misguided. The present entrapment rule is based on the premise that it is contrary to public policy to tempt innocent persons to commit crimes. Consequently, the case law has sought to enforce this rule by focusing on the subjective nature of the defendant— was he predisposed to commit the crime solicited? However, such an approach not only requires very difficult and speculative jury determinations by its very nature, but ignores the other element of our present policy. That is, the policy as stated seeks to deter the use by police of criminal temptation as well. Thus, the rule should focus on

---

1. The *Whitlock* Court rested its decision on its holding that the record before them showed as a matter of law that no entrapment existed. Therefore, it did not reach the question of

whether the trial court's instruction in this regard was correct. *Whitlock, supra,* at 542, 356 P.2d 492.

the nature of the police conduct involved as well as the person at whom it is directed.

Such an approach has been taken by both the Alaska and California supreme courts. In *Evans v. State*, 550 P.2d 830, 844 (Alaska 1976), the Alaska Supreme Court gave a statement of its so-called "objective" theory of entrapment:

"[U]nlawful entrapment occurs when a public law enforcement official, or person working in cooperation with him, in order to obtain evidence of the commission of an offense, induces another person to commit such an offense by persuasion or inducement which would be effective to persuade an average person, other than one who is ready and willing to commit such an offense. Conversely, instigations which would induce only a person engaged in a habitual course of unlawful conduct for gain or profit do not constitute entrapment."

The Supreme Court of California has described the test derived from its "hybrid position" as follows:

"Was the conduct of the law enforcement agent likely to induce a normally law-abiding person to commit the offense? For the purposes of this test, we presume that such a person would normally resist the temptation to commit a crime presented by the simple opportunity to act unlawfully."

*People v. Barraza*, 23 Cal.3d 675, 153 Cal. Rptr. 459, 591 P.2d 947, 954 (1979).

Both of these tests have in common a greater emphasis on the conduct of the investigating officers than the subjective predisposition test endorsed by the United States Supreme Court.[2] In addition, because both tests rely on more objective standards of the type so commonly utilized in the common law, the tests offer both greater consistency and facility in application. As I have recently said, this Court has an admi-

rable history of leading, not merely following other jurisdictions. *State v. Lang*, 105 Idaho 683, 672 P.2d 561 (1983). It should continue that tradition.

In the present case, however, my view is that any test properly applied should yield a verdict of not guilty by reason of entrapment. First of all, there is no evidence that Hansen had ever previously sold marijuana. In fact, Hansen's own uncontroverted testimony was that he, in fact, had *never* sold marijuana, Tr., p. 164. Second, the method of investigation used by Agent Thomas far transgresses the acceptable bounds of police ethics. Not only did Agent Thomas repeatedly and insistently importune Hansen for marijuana, a practice which unfortunately may have become a condoned and commonplace police tactic (Abscam cases), but she in fact moved herself and her family into Hansen's residence and, upon at least two occasions, slept with Hansen in his bed. Tr., p. 137. There was further testimony which, though unclear as to the context in which it was offered, clearly attests to the wanton moral character and approach of Agent Thomas and her family in this matter.[3] In my view, it is clear that the state has neither shown Hansen's predisposition to commit such a crime, nor shown adequate justification for its own sorry involvement in the proceedings. Clearly then, under any view, there was clearly a jury question presented as to whether Hansen was entrapped by a police approach which many people will consider well beyond the pale of acceptable law enforcement techniques and behavior. Such being the case, Hansen was entitled to jury instructions which properly and adequately instructed the jury on the entrapment defense—instruction which, unhappily, he was denied.

In addition, however, even if entrapment may not be shown under the subjective

---

**2.** I note in passing that the definition of entrapment offered by the trial court in its Instruction No. 12 would seem to meet my criterion providing that "innocent," as used in that instruction, is not synonymous with a complete lack of criminal predisposition. My own view is that

subjective inquiry into a person's predisposition is generally irrelevant.

**3.** *See, e.g.*, Tr., pp. 154–55, where Hansen testifies as to the sexual inducement offered by Agent Thomas' daughter, etc.

approach, there may be other defenses available based on outrageous police tactics. In *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), though a majority of the Court reaffirmed the "subjective" theory of entrapment, a separate majority concluded that either due process principles or the Court's supervisory powers could, where there is "police overinvolvement in crime . . . reaching a demonstrable level of outrageousness," bar conviction. *Hampton, supra,* 96 S.Ct. at 1653 n. 7. Indeed, the conduct of the police in the present case, albeit on a moral rather than on a physical level, recalls the words of Justice Frankfurter in *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952):

> "Applying these general considerations [of the principles of due process] to the circumstances of the present case, we are compelled to conclude that the proceedings by which this conviction was obtained do more than offend some fastidious squeamishness or private sentimentalism about combatting crime too energetically. This is conduct that shocks the conscience. Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation.

> "It has long since ceased to be true that due process of law is heedless of the means by which otherwise relevant and credible evidence is obtained. This was not true even before the series of recent cases enforced the constitutional principle that the States may not base convictions upon confessions, however much verified, obtained by coercion. These decisions are not arbitrary exceptions to the comprehension right of States to fashion their own rules of evidence for criminal trials. They are not sports in our constitutional law but applications of a general principle. They are only instances of the general requirement that States in their prosecutions respect certain decencies of civilized conduct. Due process of law, as a historic and generative principle, precludes defining, and thereby confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend 'a sense of justice.'"

Therefore, I conclude that the defendant was prejudiced by the trial court's failure to adequately and properly instruct the jury on his defense of entrapment and should receive a new trial. In addition, regardless of whether the defendant, in a fair trial, might or might not prevail in his defense of entrapment, the conduct of the investigating officer in this case was clearly entitled to be covered by proper instructions. For these reasons, I respectfully dissent.