456 So.2d 471 (1984)
Eugene Edward MORRIS a/K/a Mercury Morris a/K/a Gene Morris, Appellant,
v.
The STATE of Florida, Appellee.
No. 83-198.
District Court of Appeal of Florida, Third District.
June 5, 1984.
Rehearing Denied October 9, 1984.
*472 Bennett H. Brummer, Public Defender, and Highsmith, Strauss & Glatzer and Philip E. Glatzer and Ronald I. Strauss; Gelber, Glass, Durant, Canal & Pineiro and N. Joseph Durant, Sp. Asst. Public Defenders, for appellant.
Jim Smith, Atty. Gen., and Carolyn Snurkowski, Asst. Atty. Gen., Janet Reno, State Atty., and Ira N. Loewy and Gregory Victor, Asst. State Attys., for appellee.
Before BARKDULL, BASKIN and FERGUSON, JJ.
BASKIN, Judge.
Defendant Eugene Edward ("Mercury") Morris was convicted of conspiracy to traffic in cocaine, trafficking in cocaine, and two counts of possession of cocaine in violation of sections 777.04, 893.135, and 893.13(1), Florida Statutes (1981). He was sentenced to a term of twenty years imprisonment with a mandatory fifteen year period of incarceration pursuant to section 893.135(1)(b)(3). Finding no reversible error raised by the points on appeal, we affirm.
The events leading to this appeal began to unfold in the summer of 1982 when Fred Donaldson, a friend who turned confidential informant, did some gardening for Morris at his home. At that time Donaldson was on probation for the commission of aggravated battery and had been ordered to pay restitution in the amount of $2,500. In an alleged effort to make the restitution, Donaldson tried unsuccessfully to collect the money Morris owed him for gardening *473 services. Believing that Morris intentionally failed to pay his debt in order to have Donaldson sent back to jail, Donaldson called the police to report that he had information concerning Morris's involvement with the use and sale of cocaine. After Donaldson's first call, chief investigator Havens conducted a preliminary investigation of Morris. The investigation disclosed no record of cocaine use or sale in any local, state or federal law enforcement agency. A few days later, Donaldson contacted Havens again to advise him that Morris was expecting a shipment of cocaine and that Morris was willing to meet Donaldson's friend "Joe" to "set up a deal." In two subsequent telephone calls, Donaldson told Havens that Morris had received a large quantity of cocaine.
To verify this information, Havens arranged to have Donaldson make a recorded "controlled call" from the state attorney's office to Morris at his home on August 16, 1982. In this first recorded telephone conversation, admitted into evidence at trial, Morris demonstrated a willingness to enter into a drug deal with Donaldson's purported friend Joe.[1] They arranged to meet at Dadeland Mall parking lot. During several ensuing meetings, Donaldson introduced undercover agent Joe Brinson to Morris as Donaldson's drug dealer friend Joe from New York, and Brinson negotiated with Morris to purchase a quantity of cocaine. The monitored conversations of these meetings, transmitted through a body bug worn by agent Brinson, were admitted into evidence at trial. The tapes of these encounters reveal that Brinson and Morris negotiated the price, quantity and manner of delivery of the cocaine, and on one occasion, Morris gave Brinson a small quantity of cocaine as a sample. Negotiations between Brinson and Morris continued the following day and evening of August 17, during which time Brinson and Morris spoke together both in person and over the telephone. Three of these conversations were monitored and tape recorded, but the tapes of only two telephone conversations were admitted into evidence. The trial court suppressed the third tape recording of a face-to-face conversation between Morris and Brinson because it was made illegally inside Morris's home. A final monitored and tape recorded conversation between Morris and Brinson took place the morning of August 18. During this conversation, *474 admitted into evidence at trial, Morris and Brinson agreed to meet at Morris's house later that day. This conversation served as the basis for the issuance of a warrant to search Morris's home and for a court order authorizing the agent to monitor and record conversations inside Morris's home in accordance with State v. Sarmiento, 397 So.2d 643 (Fla. 1981). Although the Sarmiento order specifically provided that the body bug which would record the conversations inside Morris's home was to be placed on agent Brinson, the monitoring device was placed on Donaldson. As a result, these recorded conversations were suppressed by the trial court. The court ruled that the police acted improperly in transferring the body bug to Donaldson.
The search produced a scale which was introduced at trial. The half-kilogram of cocaine, which formed the basis for the trafficking charge, was delivered to Morris's home by dealer and co-defendant Vincent Cord. In the scenario culminating in Morris's arrest, Cord arrived at Morris's home and gave Morris a package of cocaine. Morris then weighed the contents and handed the cocaine to agent Brinson, who carried the bag outside and placed it in the trunk of his own car. When Morris heard police sirens, he retrieved the package from Brinson's car and threw it into the canal behind his house. Agent Havens subsequently recovered the cocaine from the water, and Morris and co-defendants Vincent Cord and Edgar Kulins were placed under arrest.
Co-defendant Cord pled guilty prior to trial. The case proceeded to trial against Morris and Kulins. Kulins pled guilty during trial, leaving only the case against Morris. Morris pled not guilty to all charges: conspiracy to traffic in cocaine, trafficking in cocaine, two counts of sale or delivery of cocaine, and two counts of possession of cocaine. He asserted the affirmative defense of entrapment. The jury acquitted Morris of sale or delivery of cocaine, but found him guilty of the remaining counts. This appeal ensued.
In the several points raised on appeal, Morris argues as grounds for reversal: (1) the court's refusal to suppress evidence and statements obtained by unlawful electronic surveillance; (2) legally inconsistent verdicts; (3) the exclusion of a defense witness who would have testified that a police agent intended to set Morris up; (4) inflammatory remarks by the prosecutor during closing argument; and (5) the imposition of a mandatory sentence. Although we conclude that none of the asserted grounds warrants reversal, we address the major contentions raised by Morris.
We first focus our attention on the excluded testimony. Morris contends that the trial court committed reversible error in excluding the testimony of defense witness Eugene Gotbaum who, according to the proffer, would have stated that he had known informant Fred Donaldson for many years and that several months prior to Morris's arrest, Donaldson told Gotbaum that he (Donaldson) intended to set up Morris.[2] Although it was Donaldson who initially advised the police that Morris was engaged in illicit activities involving drugs, the state did not call Donaldson to testify at trial. When defense counsel sought to present Gene Gotbaum's representation of the absent Donaldson's motives, the court excluded Gotbaum's testimony on the ground *475 that the proffered remarks constituted inadmissible hearsay. Morris contends that Gotbaum's testimony was admissible through the so-called state-of-mind exception to the hearsay rule to inform the jury of Donaldson's stated intent to induce or entice Morris to commit the criminal acts charged. Morris maintains that Donaldson's statement was relevant to his entrapment defense and that he should have been permitted to present Donaldson's comments through Gotbaum's testimony, even though Donaldson was not called as a witness.[3]
The state-of-mind exception is contained in section 90.803(3)(a)(1) and (2), Florida Statutes (1981):
The provision of s. 90.802 to the contrary notwithstanding, the following are not inadmissible as evidence, even though the declarant is available as a witness:
.....
(3) Then existing mental, emotional, or physical condition. 
(a) A statement of the declarant's then existing state of mind, emotion, or physical sensation, including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health, when such evidence is offered to:
1. Prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when such state is an issue in the action.

2. Prove or explain acts of subsequent conduct of the declarant. (emphasis supplied)
The state-of-mind exception to the hearsay rule permits the admission of extrajudicial statements to show the declarant's state of mind at the time the statement is made when it is an issue in the case. See United States v. Brown, 490 F.2d 758 (D.C. Cir.1974); Kennedy v. State, 385 So.2d 1020 (Fla. 5th DCA 1980); Van Zant v. State, 372 So.2d 502 (Fla. 1st DCA 1979). In addition, the state-of-mind exception allows the introduction of the declarant's statement of future intent to perform an act, if the occurrence or performance of that act is at issue. See Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892); United States v. Brown; Clark v. United States, 412 A.2d 21 (D.C. 1980); Kennedy; Van Zant. Donaldson's declaration of intent to "set up" Morris does not fall within the ambit of the hearsay exception provided by section 90.803 because Donaldson's state of mind is not at issue and because it was not disputed, his subsequent conduct requires neither proof nor explanation. Under the subjective test for entrapment adopted by the United States Supreme Court and followed in Florida, two issues arise: (1) whether the defendant was predisposed to commit the type of crime charged and (2) whether the defendant was induced by a government agent to commit the crime charged. See Hampton v. United States, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); United States v. Russell, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932); State v. Dickinson, 370 So.2d 762 (Fla. 1979). The subjective approach to the entrapment defense focuses upon the "intent or predisposition of the defendant *476 to commit the crime."[4]Russell, 411 U.S. at 429, 93 S.Ct. at 1641; accord Hampton; Dickinson; State v. Casper, 417 So.2d 263 (Fla. 1st DCA 1982); State v. Brider, 386 So.2d 818 (Fla.2d DCA), review denied, 392 So.2d 1372 (Fla. 1980). Explaining the critical element of predisposition in the application of the entrapment defense, the court in Dupuy v. State, 141 So.2d 825, 826 (Fla.3d DCA), cert. denied, 147 So.2d 531 (Fla. 1962) stated:
[E]ntrapment is available to those who are instigated, induced or lured by an officer of the law or other person to commit a crime which they had otherwise no intention of committing and, conversely, not available to those with the requisite criminal intent who are merely furnished with the opportunity to commit crime by an officer of the law or other person acting in good faith with the purpose of detecting and preventing crime.
See Dickinson; Lashley v. State, 67 So.2d 648 (Fla. 1953).
Explaining the subjective test for entrapment, the Court in Russell 411 U.S. at 438, 93 S.Ct. at 1646 observed:

Sorrells and Sherman both recognize "that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution." 287 U.S., at 441, 53 S.Ct., at 212, 356 U.S., at 372, 78 S.Ct., at 820. Nor will the mere fact of deceit defeat a prosecution, see e.g., Lewis v. United States, 385 U.S. 206, 208-209, 87 S.Ct. 424, 425-427, 17 L.Ed.2d 312 (1966), for there are circumstances when the use of deceit is the only practicable law enforcement technique available. It is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play.
In Sherman 356 U.S. at 372-373, 78 S.Ct. at 821-822 the Court stated:
To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal. The principles by which the courts are to make this determination were outlined in Sorrells. On the one hand, at trial the accused may examine the conduct of the government agent; and on the other hand, the accused will be subjected to an "appropriate and searching inquiry into his own conduct and predisposition" as bearing on his claim of innocence. (emphasis supplied).[5]
*477 These cases establish the principle that the material issues raised by an entrapment defense are solely the predisposition of the defendant and the conduct of the police. The state of mind at issue in this case is that of the defendant and not that of the police agent. See generally Hampton; Russell; Comment, Causation and Intention in the Entrapment Defense, 28 U.C.L.A.L.Rev. 859 (1981); Park, The Entrapment Controversy, 60 Minn.L.Rev. 163 (1976).
Gotbaum's testimony was offered to prove Donaldson's intent to set up Morris. It constituted inadmissible hearsay because Donaldson's intent was not at issue and thus, did not become admissible under the aegis of the statutory exception. In addition, because there was no question that Donaldson notified the police of Morris's activities, Donaldson's conduct was not disputed and, accordingly, his statement was not relevant. Although his motive might have been relevant had it been necessary to prove whether Donaldson informed police, under the posture of the evidence presented at trial, the trial court properly excluded Gotbaum's testimony.
We now turn to the remaining points on appeal. Morris asserts that the trial court erred in refusing to suppress the monitored and tape-recorded telephone conversations emanating from his home and obtained without a warrant. The phone calls in question were initiated by a consenting police agent from a telephone outside Morris's home to a phone inside his home and were recorded by means of an induction coil attached to the outside phone. The warrantless interceptions were made pursuant to section 934.03(2)(c), Florida Statutes (1981), which provides:
It is lawful under this chapter for a law enforcement officer or a person acting *478 under the direction of a law enforcement officer to intercept a wire or oral communication when such person is a party to the communication or one of the parties to the communication has given prior consent to such interception and the purpose of such interception is to obtain evidence of a criminal act.
Morris contends that despite the authorization of the statutory consent provision, the warrantless interception and recording of telephone calls from government agents to Morris at his residence were unconstitutional intrusions into the home in violation of Article I, section 12, Florida Constitution (1968). The Florida Supreme Court recently decided this issue adversely to appellant in State v. Williams, 443 So.2d 952 (Fla. 1983), in which the court, finding that such an interception does not contravene Article I, section 12 of the Florida Constitution, stated:
Here the conversation was by telephone and only the target of the investigation was within her home. We decline to characterize this conversation as having been conducted in her home. We therefore hold that Sarmiento does not apply and, accordingly, that section 934.03(2)(c) does. Accord State v. Vanyo, 417 So.2d 1104 (Fla. 4th DCA 1982); Miller v. State, 411 So.2d 944 (Fla. 4th DCA), rev. denied, 419 So.2d 1199 (Fla. 1982); Jacobs v. State, 389 So.2d 1054 (Fla.3d DCA 1980), rev. denied, 397 So.2d 778 (Fla. 1981); State v. Shaktman, 389 So.2d 1045 (Fla.3d DCA 1980), rev. denied, 397 So.2d 779 (Fla. 1981).
Williams, 443 So.2d at 954.
We find no merit in Morris's other challenges to the admission of his intercepted conversations.
No reversible error appears in the record in connection with the search warrant which yielded the scale admitted into evidence at trial. Morris contends that the evidence was tainted as fruit of the poisonous tree because the state engaged in warrantless interceptions and failed to inform Judge Kogan of its activities when it sought issuance of a search warrant. Although we condemn the concealment of pertinent facts from the trial court, we believe that the trial judge was apprised of facts sufficient to establish probable cause to issue the search warrant.[6]
*479 Morris next contends that by returning not guilty verdicts on the two counts of sale or delivery of cocaine to a government agent, the jury necessarily accepted his entrapment defense as to all charges. Thus, Morris maintains, the guilty verdicts on the remaining charges of conspiracy, possession and trafficking are legally inconsistent and should not stand. A review of Florida law reveals that "true" legal inconsistency has been found in cases where "the jury's acquittal on one count appeared to negate a specific element necessary for conviction on the other count." Gonzalez v. State, 440 So.2d 514 (Fla. 4th DCA 1983). See Redondo v. State, 403 So.2d 954 (Fla. 1981); Mahaun v. State, 377 So.2d 1158 (Fla. 1979); Ayrado v. State, 431 So.2d 320 (Fla.3d DCA 1983). As the supreme court recently noted in Eaton v. State, 438 So.2d 822, 823 (Fla. 1983), "[t]he jury is ... required to return consistent verdicts as to the guilt of an individual on interlocking charges." See, e.g., Redondo (possession of a firearm during the commission of a felony and underlying aggravated battery); Mahaun (felony murder and underlying felony). In the present case the jury did not return verdicts on interlocking charges, but rather acquitted Morris of charges separate and distinct from those upon which he was convicted.
Morris urges error in the trial court's failure to declare a mistrial for an allegedly impermissible golden rule comment made by the prosecutor during final argument. The prosecutor stated:
And Gene Morris gets on the stand and he says, "I'm sorry for the things I have done, I'm sorry for getting involved in drugs, I'm sorry," but he did more than get involved in drugs and be a user. He was predisposed. He's been involved in deals before and sorry just isn't enough.
When your  when your son or your daughter takes some money out of your pocket or purse when you're not looking and you find out they did that 
MR. STRAUSS: Your Honor 
MR. YOSS: Let me rephrase.
MR. STRAUSS: Treading into areas  note my objection.
MR. YOSS: When somebody does something wrong, you say you're sorry, sometimes sorry just isn't enough. Sometimes it must be accountability and punishment. You don't have to worry about punishment, but you sure have to worry about accountability.
We find no reversible error in these comments. Any impropriety in the argument was immediately cured when the prosecutor rephrased his remarks. See *480 James v. State, 429 So.2d 1363 (Fla. 1st DCA 1983). Furthermore, this point was not properly preserved for review. Defense counsel obtained no ruling on his objection and failed to request a curative instruction from the court. Ferguson v. State, 417 So.2d 639 (Fla. 1982); Smith v. State, 365 So.2d 405 (Fla.3d DCA 1978), review denied, 402 So.2d 613 (Fla. 1981). Morris's motion for mistrial, made after the jury had been charged and had retired to deliberate, came too late to preserve Morris's objection for appeal. State v. Cumbie, 380 So.2d 1031 (Fla. 1980). The comments did not constitute fundamental error, and no basis for reversal has been demonstrated.
Finally, Morris asserts that by refusing to hold an evidentiary hearing directed to mitigation of his sentence, the trial court erroneously denied him an opportunity to challenge the minimum mandatory sentence on the ground that it was unconstitutionally applied to him. Morris relies on section 893.135(3), Florida Statutes (1981):
The state attorney may move the sentencing court to reduce or suspend the sentence of any person who is convicted of a violation of this section and who provides substantial assistance in the identification, arrest, or conviction of any of his accomplices, accessories, co-conspirators, or principals. The arresting agency shall be given an opportunity to be heard in aggravation or mitigation in reference to any such motion. Upon good cause shown, the motion may be filed and heard in camera. The judge hearing the motion may reduce or suspend the sentence if he finds that the defendant rendered such substantial assistance.
Morris contends that he was instrumental in achieving the conviction of other principals involved in this case and that his substantial assistance entitled him to a hearing to determine whether the court should consider reducing or suspending his sentence. The trial court may not reduce or suspend the mandatory sentence compelled by section 893.135(3) unless the state attorney first files a motion to mitigate. As the court stated in State v. Taylor, 411 So.2d 993, 994 (Fla. 4th DCA 1982):
[A]s part of the legislative scheme to stem trafficking in drugs the Legislature authorized trial courts to mitigate a mandatory sentence upon motion by the State Attorney if the convicted person provides substantial assistance in the identification, arrest, or conviction of any of his accomplices, accessories, co-conspirators, or principals. § 893.135(3), Fla. Stat. (Supp. 1980). No further authority is reposed in the trial court to mitigate a mandatory minimum sentence in trafficking cases.
Because the record reflects that the state attorney did not file a motion to mitigate the mandatory minimum sentence, we find no error in the trial court's refusal to conduct an evidentiary hearing on Morris's claim.
We are not unsympathetic to the severity of the sentence Morris received; however, this court is without power to contravene legislative enactments and policy decisions within the purview of other branches of government.
Based upon the foregoing reasons and authority, we affirm the convictions and sentences.
Affirmed.
FERGUSON, Judge (dissenting).
If all the facts set out in the majority opinion had been heard by the jury, this case probably would not be here or if so, I would not be dissenting. Evidence crucial to the entrapment defense was withheld from the jury for reasons which find no support in case law or any rational construction of the evidentiary rules. If that evidence had been admitted, as it should have been, the jury might have concluded, as I have, that this was a text-book case of entrapment.
First, what is entrapment? Entrapment occurs, as succinctly stated by Justice Hughes, "when the criminal design originates with the officials of the Government, *481 and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." Sorrells v. United States, 287 U.S. 435, 442, 53 S.Ct. 210, 213, 77 L.Ed. 413, 417 (1932). Moreover, "the issue of entrapment is for the jury to decide... . Once the defendant has discharged [his] obligation, the prosecution must ultimately prove beyond a reasonable doubt that the defendant was not entrapped into committing the offense." United States v. Buckley, 586 F.2d 498, 501 (5th Cir.1978), cert. denied, 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 242 (1979).
The state has successfully diverted the majority's attention to the profane discussions of a drug transaction. A completed offense is admitted so the facts are pertinent only insofar as they bear on the question of entrapment. The sole inquiry here would have been, ordinarily, whether the state proved beyond a reasonable doubt the nonexistence of entrapment. But all the evidence which tended to prove that the criminal design originated with the state was excluded, the effect of which was to direct a verdict against the defendant on the entrapment defense.
The main issue here is whether testimony that a government agent previously expressed an intent, motive, and plan to setup the defendant for prosecution is inadmissible on grounds that the testimony is hearsay or irrelevant, where the agent is not called as a witness at trial. The majority either agrees with the trial court that the testimony was inadmissible hearsay, or accepts the state's alternative argument that evidence of government instigation was irrelevant. I would disagree that either, as a basis for excluding the evidence, is correct.
Two laudable concessions made by the state in its brief and at oral argument facilitate presentation of the facts. First, the defendant was "set-up" by the state, aided throughout by the informant Donaldson, and second, the informant Donaldson was at all pertinent times the state's agent. These concessions, however, were not conveyed to the jury with specificity or clarity. Although the jury knew that Donaldson, the informant, was on probation for a criminal offense (the offense was aggravated battery wherein he had bit off the ear of a man who he accused of stealing a cockatiel which Donaldson claimed had been sent to him by God), they were not apprised that he at all times acted as an agent for the state or that he was granted immunity for his role.
Donaldson, who had an extensive criminal record which included illegal drug convictions, feared being returned to jail if he did not make money restitution payments to the victim pursuant to the conditions of his probation. He was angry at Morris because he believed that Morris was intentionally withholding money owed so that he (Donaldson) would go back to jail. The assistant state attorney and his investigator withheld from the magistrate information on Donaldson's background and his active involvement in the Morris investigation when they sought a warrant. Further, the state did not call Donaldson as a witness at trial because it knew Donaldson to be an unbelievable witness.
In opening statements, defense counsel told the jury that he would prove, consistent with an entrapment defense, that the criminal design originated with Donaldson, a crazed informant, in a plan to lure the defendant into committing an offense for the purpose of prosecution. All of the defendant's attempts to develop that announced defense by direct and cross-examination of state agents were thwarted. The state's objections to the questions, on grounds of both hearsay and irrelevancy (or without stating the grounds), were sustained. The court also would not permit the defense to call Donaldson as an "adverse witness" so as to challenge his credibility, competence, and motives. Against that background, Gotbaum, whose testimony was excluded, would have testified that he had known Donaldson for several years; that Donaldson had stated prior to August 1982 that he was going to "set-up" Morris for prosecution; and that Donaldson was a drug abuser who hallucinates, and who in Gotbaum's opinion is totally incompetent.
*482 Those selected facts that are set out in the majority opinion need refinement. The suggestion of a drug deal for profit originated with Chief Investigator George Ray Havens of the state attorney's office allegedly as a test of Donaldson's veracity. Donaldson was instructed by Havens to tell Morris that there was a friend from New York named "Joe" who would meet with them at the Dadeland Shopping Center to discuss a cocaine sale. All of this preceded the first recorded telephone conversation which is set out in the majority opinion. The evidence in the case, from the defendant and the state witnesses, indicates that the defendant was a user but was not a seller of drugs. It is undisputed that Morris had no ready access to large amounts of cocaine and that the sample produced for the first meeting negotiations was furnished by the state through Donaldson.
Also omitted from the majority statement of facts is the extent of the state's efforts to induce the commission of the offense even after one of its agents had become convinced that Morris was unable to arrange a drug deal.
The first "controlled call" planning a drug purchase was made from the state attorney's office on August 16, 1982. During the meeting of August 16, the state offered to buy two kilos of cocaine and showed Morris $120,000. Morris did not deliver. At the conclusion of the meeting, Donaldson requested that Morris give to Brinson, another agent who had joined the investigation, a sample of cocaine. Morris went to his car, then returned and handed Brinson a small packet of cocaine.
The state scheduled another meeting for that day in the Dadeland Shopping Center between Brinson and Morris. Again Brinson had $120,000 but Morris did not deliver cocaine. Three more meetings were arranged and recorded. At all of these meetings, Brinson was prepared to buy cocaine but Morris did not deliver. Brinson advised Chief Havens that he did not believe that Morris had any cocaine. Chief Havens instructed Brinson to continue the investigation and to "encourage" Morris to commit the offense.
On August 17, 1982, the informant Donaldson placed another electronically recorded telephone call to Morris' home for the purpose of arranging another meeting for 3:00 p.m. at the Dadeland Shopping Center. Morris agreed to be present but did not show. Additional calls by the state to Morris' home resulted in another meeting at 9:30 p.m. in a South Miami park. State attorney investigators were prepared to make an arrest. Morris appeared without cocaine and left after a few seconds. Brinson and Donaldson attempted unsuccessfully to contact Morris at his home several times that evening.
The state resumed its effort on the morning of August 18, 1982, by having Donaldson place another electronically recorded call to Morris at his residence. A meeting was arranged for 3:00 p.m. that afternoon. Brinson and Donaldson met with Morris at his home at approximately 3:35 p.m. as prearranged. Morris finally delivered a bag of cocaine to Brinson outside his home about an hour later and was arrested. His home was searched and codefendants Kulins and Cord were also arrested.
Morris testified at trial that Donaldson initiated the plan to put Donaldson's New York friend in touch with cocaine dealers; that he was hesitant at first because although he was unemployed and needed funds, he was soon to start receiving a disability pension which he didn't wish to jeopardize. He admitted to the previous purchase of small amounts of cocaine for personal use but denied having ever sold cocaine. He testified that the sole source for the cocaine purchase for his user's habit was codefendant Cord and two other persons named Trexell and Olsen. The one-half kilo of cocaine delivered to Agent Brinson was taken by Morris from the glove compartment of Cord's automobile while Cord looked on.
Cord, an admitted drug supplier, entered a plea of guilty and testified for the state in exchange for a lenient sentence. Kulins, another codefendant, was tried along with Morris. At the conclusion of the evidence the state offered both defendants a waiver of the mandatory minimum sentences in *483 exchange for guilty pleas.[1] Kulins accepted. Morris declined. Both Cord and Kulins gave testimony consistent with Morris'. Cord testified that Morris called him on the evening of August 16, 1982, but he hung up on him because Morris owed him small amounts of money for "user's cocaine." Because Cord would not speak to Morris, the codefendant Kulins intervened and told Cord that Morris had a friend from New York who wanted to buy two kilos of cocaine. Cord supplied a sample given to the agents as well as the one-half kilo which was seized on August 18. Cord testified that three or four times in the past he had sold small amounts of cocaine to Morris. Kulins testified that he had no involvement in the cocaine dealings and that he became involved because Morris told him that Donaldson was "bugging him to try to get some cocaine."

HEARSAY
Morris argues that the testimony of Gotbaum was admissible as an exception to the hearsay rule because it showed an intent, plan, and motive to entrap, relying on Jenkins v. State, 422 So.2d 1007 (Fla. 1st DCA 1982) and Spears v. State, 264 Ark. 83, 568 S.W.2d 492 (1978). Jenkins was a prosecution for aggravated battery. The defense was self-defense. The court held that the statement of a witness who heard the victim say, while approaching the defendant with a knife, that "I'm going to straighten [defendant] up," while clearly hearsay, was admissible under a hearsay exception as a statement of intent which was probative of the victim's conduct. The conviction was reversed because the jury had not been permitted to hear the testimony. The Jenkins case relied on Sections 90.803(3)(a)1 and 2, Florida Statutes (1981) which provide as an exception to the hearsay rule:
(3) THEN EXISTING MENTAL, EMOTIONAL, OR PHYSICAL CONDITION. 
(a) A statement of the declarant's then existing state of mind, emotion, or physical sensation, including a statement of intent, plan, motive, design, ... when such evidence is offered to:
1. Prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when such state is an issue in the action.
2. Prove or explain acts of subsequent conduct of the declarant.
Spears v. State, 264 Ark. 83, 568 S.W.2d 492 (1978), a decision of the Arkansas Supreme Court, is squarely on point  both factually and legally. Spears was convicted of sale and possession of narcotics. His defense was entrapment. In reversing the conviction, the court held that the fact that the government informer who allegedly "set-up" the defendant did not testify was an improper basis for excluding testimony as to his relations with the defendant. It was further noted:
Showing that [the informant] was addicted to drugs and had dealt in them was relevant. Statements made by him pertaining to his motivation to induce an acquaintance to deliver controlled substances would be relevant. The state contends that this testimony was properly excluded as hearsay. A declaration by [the informant] of his intent, plan, motive or design was not excluded by the hearsay rule [cites omitted]. The conduct of a government informant in connection with the transaction, and the purpose of *484 his conduct and communications are proper matters for examination and inquiry at trial. Sherman v. U.S., 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); People v. Judd, 170 Cal. App.2d 212, 338 P.2d 458 (1959).
The Arkansas Evidence Code which was construed in Spears v. State is essentially the same as the Florida code.
Hearsay and relevancy, although sometimes overlapping and frequently confused  as suggested by the state's attempt to distinguish the Jenkins and Spears cases[2] and by the quote from the Spears decision itself  are two distinct evidentiary concepts. Evidence is relevant if it applies to the matter in question, even though it may be inadmissible as hearsay. Hearsay evidence comes from a second-hand source, competency and credibility of which cannot be tested and so it may not be admissible even though relevant. In this part of the discussion, our only concern is whether the hearsay rule was a bar to the admission of Gotbaum's testimony as was found by the trial court.
Section 90.803(3)(a)1 provides that a statement of intent which is offered to prove intent is admissible, even if otherwise hearsay, only if that intent is at issue. Section 90.803(3)(a)2, on the other hand, contains no similar internal relevancy requirement when such statement is offered to prove not the intent itself, but conduct consistent with that intent. Under this latter section, hearsay, not relevancy, is the only pertinent inquiry. Since the statements of the informant Donaldson regarding his intent, plan, and motive were being offered through Gotbaum to prove or explain acts of subsequent conduct, Section 90.803(3)(a)1 of the evidentiary rule, which is central to the majority discussion, is not pertinent. It is elementary that evidence of a mental state, as for example a plan or design, where offered to show that the person who had the state of mind later carried it out by suitable action, is an exception to the rule which forbids evidence of out-of-court assertions to prove the facts asserted in them. McCormick, Handbook of the Law of Evidence § 249 (2d ed. 1972).
Assuming the majority characterization of the evidence as irrelevant to mean something other than inadmissible under the hearsay rule, the discussion continues.

RELEVANCY
As an alternative argument, the state contends that where a defendant is predisposed or has the requisite intent to commit the crime, there can be no valid entrapment irrespective of government conduct, citing State v. Dickinson, 370 So.2d 762 (Fla. 1979), Bell v. State, 369 So.2d 932 (Fla. 1979), Lashley v. State, 67 So.2d 648 (Fla. 1953), and Dupuy v. State, 141 So.2d 825 (Fla.3d DCA), cert. denied, 147 So.2d 531 (Fla. 1962). As a general statement of the law, the contention is accurate. But the question presented here and not addressed by those cases, as more narrowly drawn, is whether in a trial by jury, the court may find predisposition as a matter of law, and then exclude evidence of government conduct.[3]
Entrapment is an affirmative defense in avoidance whereby an accused must show (1) that he was instigated, induced, or lured by an officer of the law or other person, for the purpose of prosecution, into the commission of a crime, and (2) that he had otherwise no intention of committing the offense. Lashley v. State, 67 So.2d 648, 649 (Fla. 1953). Accord People v. Judd, 170 Cal. App.2d 212, 338 P.2d 458 (1959). Contrary to the state's position, government conduct is an element of the entrapment defense. Even if the state had presented a scintilla of predisposition evidence, which is concededly the main focus of an entrapment defense, the fact-finder could still find the government's conduct perfidious to the point that an independent inclination on the part of the accused to commit the offense would be negated. United States v. Russell, 411 U.S. 423, 431-32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366, 373 (1973) (conduct *485 of law enforcement agents could be so outrageous that due process principles would absolutely bar the government from invoking the judicial process to obtain a conviction). This was precisely what the Supreme Court had in mind when the entrapment defense became part of our criminal jurisprudence, and was obviously the state's concern when it sought to exclude the evidence. See Sorrells v. United States, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932) (legislature could not have intended that conduct induced by government agents should be deemed to fall within criminal statutory proscriptions).
The cases relied upon by the state which hold that there can be no valid entrapment where there is evidence of predisposition are appeals after conviction, where a jury has heard the evidence of both government conduct and the accused's predisposition and has decided, as an issue of fact, that there was no entrapment. It is not the province of the court to find the existence of predisposition  an element of the state's "defense" to entrapment  so as to exclude, as irrelevant, testimony of government conduct.
The courts have wrestled over the years with the question whether predisposition can be established at all with any degree of certainty. The United States Supreme Court noted the difficulty presented, then settled for the approach, clearly articulated by Justice Rehnquist, that whether there is such a predisposition is a fact question for the jury. See Russell, 411 U.S. at 433, 93 S.Ct. at 1643, 36 L.Ed.2d at 374. The Russell court thus explicitly reaffirmed the holdings from Sorrells and its progeny, that predisposition and government inducement present facts to be decided by a jury where entrapment is raised as a defense:
The predisposition and criminal design of the defendant are relevant. But the issues raised and the evidence adduced must be pertinent to the controlling question whether the defendant is a person otherwise innocent whom the Government is seeking to punish for an alleged offense which is the product of the creative activity of its own officials. If that is the fact, common justice requires that the accused be permitted to prove it. The Government in such a case is in no position to object to evidence of the activities of its representatives in relation to the accused, ... . [e.s.] Sorrells, 287 U.S. at 451, 53 S.Ct. at 216, 77 L.Ed. at 422.
See also Sherman v. United States, 356 U.S. 369, 373, 78 S.Ct. 819, 821, 2 L.Ed.2d 848, 851 (1958) (at trial, the accused may examine the conduct of the government agent); Spears v. State, 264 Ark. 83, 568 S.W.2d 492 (1978) (conduct of non-testifying informant is relevant to entrapment defense); People v. Judd, 170 Cal. App.2d 212, 338 P.2d 458 (1959) (defendant was entitled to question government informer so as to show that he was induced to commit the offense). Cf. Lashley v. State, 67 So.2d 648, 649 (Fla. 1953) (defendant's motion to suppress testimony of government agent on ground of entrapment properly denied because "this manner of obtaining such evidence bears merely upon its credibility, not its admissibility"). The state in such cases is not free to institute an investigation and build a prosecution in partnership with an admittedly unsavory and unreliable informant, then conceal from the jury the fact of the informant's improper motive, design, active participation, and unreliability.
The state argues that Jenkins v. State is distinguishable because the excluded statement in Jenkins was relevant to the defendant's defense of self-defense, but that Gotbaum's statement in this case was not relevant to the entrapment defense because it had "no bearing on the defendant's predisposition." The argument is patently unsound. Gotbaum's statement was relevant to the entrapment defense because it had a bearing on the conduct of law enforcement officers showing the origin of a scheme, which required the active participation of law-enforcement officers, to entrap. See Sherman v. United States, 356 U.S. at 372, 78 S.Ct. at 821, 2 L.Ed.2d at 851 (entrapment occurs when the criminal conduct is the product of the creative activity of law-enforcement officials).
*486 The state also attempts to distinguish Spears v. State, on the ground that under Arkansas substantive law of entrapment, the emphasis is on the conduct of law-enforcement officers rather than on the predisposition of the defendant, and that this objective test differs from the subjective approach followed under Florida law. That observation would be meaningful only if under Florida law the conduct of law-enforcement officers were totally irrelevant, which is not the case. See Russell, 411 U.S. at 431-32, 93 S.Ct. at 1643, 36 L.Ed.2d at 373 (adopted in State v. Dickinson, 370 So.2d 762 (Fla. 1979)). Even under the strict standard espoused by a plurality of the court in Hampton v. United States, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976) (rejected by a majority of the court), where the crime originates with law-enforcement officers, and a defendant who is not otherwise predisposed to commit the contrived offense is induced to do so, the courts will not convict. See Hampton, 425 U.S. at 488-89, 96 S.Ct. at 1649, 48 L.Ed.2d at 118 (a high degree of law-enforcement participation can never make for entrapment where the predisposition of the defendant to commit the crime is established).
Sensing a flaw in its first two arguments on admissibility and relevancy, the state falls back, predictably, on the harmless error doctrine.

HARMLESS ERROR
Where a defendant makes a showing that an error at trial injuriously affected a substantial right protected by state law or violated a constitutional right, the burden shifts to the state to demonstrate that, the error aside, the evidence of guilt is overwhelming. Harrell v. State, 405 So.2d 480, 482 (Fla.3d DCA 1981); see also § 924.33, Fla. Stat. (1983). This court has held on two occasions that where admissible evidence tends, in any way, even indirectly, to prove a defendant's innocence, it is 1225 (Fla.3d DCA 1982); Chandler v. State, 366 So.2d 64, 70 (Fla.3d DCA 1978), cert. denied, 376 So.2d 1157 (Fla. 1979), aff'd, 449 U.S. 560, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981). It cannot seriously be contended that a defendant's right to a fair trial has not been severely impaired where he admits the offense, relies solely on an entrapment defense, and then the evidence which forms the heart of that defense is improperly excluded. There really should be no need to do so, but because this is a dissent I proceed to examine the evidence relied upon by the state as establishing overwhelmingly the defendant's predisposition to commit the offense of trafficking in cocaine.
The state does not set forth with particularity the evidence tending to prove predisposition and it has eluded my search of the record. Reference is made to (1) the defendant's sharing with friends in his apartment, the small amounts of cocaine which he had purchased for personal consumption, and (2) the fact that the defendant failed to reject immediately the government's offer to return him a profit in exchange for arranging a drug deal.
At the outset, I acknowledge that there is no constitutional prohibition against law-enforcement officers providing the opportunity for a person who has the willingness and readiness to break the law, and that it is only when the government's deception actually implants the criminal design in the mind of an otherwise innocent defendant that the defense of entrapment comes into play. State v. Dickinson, 370 So.2d 762 (Fla. 1979). That willingness and readiness to break the law is shorthandedly referred to as predisposition. It is defined more completely as a tendency or inclination shown, in advance, to do a certain thing. [e.s.] The American Heritage Dictionary 1032 (1980). It is said that predisposition to commit an offense can be shown by establishing a reasonable suspicion of the defendant's prior involvement in the same kind of activity, or ready acquiescence in the commission of the crime. See State v. Cruz, 426 So.2d 1308 (Fla.2d DCA 1983); State v. Casper, 417 So.2d 263 (Fla. 1st DCA 1982); Story v. State, 355 So.2d 1213 (Fla. 4th DCA), cert. denied, 364 So.2d 893 (Fla. 1978). But the state's "proof" of predisposition *487 virtually disappears under close scrutiny.
As to the first suggested proof, this court has previously rejected the notion that evidence of prior use of an illegal drug evidences a predisposition to possess a felonious quantity of it, or to sell it. Rogers v. State, 277 So.2d 838 (Fla.3d DCA 1973). A contrary holding, which the state seeks  that the use of cocaine is legal proof of a willingness to traffic in it  would be of doubtful constitutionality, and, as a practical matter, ludicrous.
The second suggested proof does not fare much better. A sister court has drawn a practical distinction between "ready acquiescence" to commit an offense, and "succumb[ing] to the lure of the bait." State v. Casper, 417 So.2d 263, 265 (Fla. 1st DCA 1982). The first is evidence of predisposition and requires that law-enforcement authorities have a prior reasonable suspicion of a defendant's involvement in the particular criminal activity before targeting him for presentation with an attractive opportunity to commit the offense. A person randomly selected or exposed, who succumbs to the temptation presented by the state, where there is not even a reasonable suspicion that he has, in the recent past, demonstrated an inclination to engage in the same or similar activity, is not legally predisposed. The reason for the distinction was noted by the United States Supreme Court in Sherman where it held that, were the rule otherwise, the government could play on the weakness of an innocent party and beguile him into committing crimes which he otherwise would not have attempted. 356 U.S. at 376, 78 S.Ct. at 822, 2 L.Ed.2d at 853. The government's attempt in Sherman to overcome the defense of entrapment by complaining that petitioner evinced a ready complaisance to sell narcotics was soundly rejected because of the absence of any evidence that defendant was otherwise in the trade.
Ready complaisance or ready acquiescence may be valid evidence of predisposition, but such readiness must find specific support in the record. See, e.g., Story v. State, 355 So.2d 1213 (Fla. 4th DCA), cert. denied, 364 So.2d 893 (Fla. 1978)(defendant walked up to window of agent's auto and inquired "what do you want?;" when officer said "heroin," defendant said: "Fine, wait here, I'll be back in about two minutes;" then returned and made transaction) and cases collected therein, e.g., Berry v. United States, 324 F.2d 407 (D.C. Cir.1963), cert. denied, 376 U.S. 959, 84 S.Ct. 972, 11 L.Ed.2d 977 (1964) (defendant who on first offer to buy, reached into his pocket and retrieved a supply of heroin, came equipped to do business); Trice v. United States, 211 F.2d 513 (9th Cir.), cert. denied, 348 U.S. 900, 75 S.Ct. 222, 99 L.Ed. 707 (1954) (easy yielding to a second offer to buy drugs which occurred within two weeks of an earlier transaction was evidence of predisposition). Here, the state attempted with dogged persistence, no less than a dozen times over a three-day period, to have the defendant commit the offense. Over half the "houndings" came after the state's own agent had become convinced that defendant had no ability to arrange a drug deal, and after the defendant had failed continuously to appear or to deliver cocaine. We have in this case no ready complaisance on the part of the defendant. See Kwasniewski v. State, 303 So.2d 373 (Fla. 1st DCA 1974) (officers' acts of "nagging" or "bugging" the defendant to obtain illegal narcotics are evidence of entrapment); Stiglitz v. State, 270 So.2d 410 (Fla. 4th DCA 1972) (same).
The state's evidence falls far short of overwhelming proof of predisposition so the error is not at all harmless. Quite to the contrary, in light of the insufficiency of evidence of predisposition, and in light of the overwhelming evidence of government origination, inducement, and encouragement to have defendant commit the offense, we could decide that there was entrapment as a matter of law.

SUPPLEMENT TO DISSENT
The majority opinion has been revised and expanded to meet points made in the dissent. The suggestion made in footnote 3 that the defendant could have avoided the *488 impact of the court's exclusionary ruling by calling the incredible informant as his own witness demonstrates amazing naivete about defending in criminal trials. Footnote 5 (which merely adds more of the profane drug discussions) does nothing to further the state's case on the issue of entrapment. It is clear, especially from the omitted part of the excerpt, that at the time of the recorded conversation Morris had no cocaine. Also omitted is the reluctance expressed by Morris owing to the fact that he had children to worry about.
Despite Morris' statements in the conversation that he was a connection that Brinson could deal with "again and again and again," Morris did not deliver any cocaine based on that conversation nor in the next dozen or so meetings scheduled by the state. More significantly, it was based on this conversation and three subsequent meetings that Brinson, an experienced narcotics agent, concluded that Morris was merely puffing and had no ability to consummate a drug deal. Rather than showing that Morris "invited participation," the added excerpt reveals only that Morris displayed a false bravado in planning a drug deal that he, at that time, could not effectuate.

CONCLUSION
As a court we are constitutionally charged with the responsibility to keep in check the excesses of the executive branch. Concurring in Sherman, Justice Frankfurter admonished:
[T]he ... courts have an obligation to set their face against enforcement of the law by lawless means or means that violate rationally vindicated standards of justice, and to refuse to sustain such methods by effectuating them... . Public confidence in the fair and honorable administration of justice, upon which ultimately depends the rule of law, is the transcending value at stake. 356 U.S. at 380, 78 S.Ct. at 825, 2 L.Ed.2d at 855-56.
There is no question but that the methods employed by the state in this case fell far below standards which we can dutifully approve.
Morris is a sometimes controversial former football player who reached prominence during the Miami Dolphins Super Bowl days of the 1970s. He retired from football after suffering serious injury. Unquestionably, that high visibility accounts for the zeal which attached to the prosecutorial effort. Until the state stepped in to manufacture an offense for the purpose of prosecuting, Morris' only transgression was self-abuse by drugs  a disease which has reached epidemic proportions among professional athletes. Now he is serving a fifteen-year mandatory minimum sentence. On this record he is entitled to, at the least, a new trial.

ON MOTION FOR REHEARING
PER CURIAM.
We adhere to the original opinion dated June 5, 1984.
FERGUSON, Judge (dissenting to denial of motion for rehearing).
Appellant cites two additional cases in support of his motion for rehearing. Brown v. State, 299 So.2d 37 (Fla. 4th DCA 1974), cert denied, 310 So.2d 740 (Fla. 1975), holds that statements of a nontestifying informant are admissible to prove entrapment when offered to show police inducement. Saviano v. State, 287 So.2d 102 (Fla. 3d DCA 1973), a decision of this court, holds that testimony of a witness which would show that police officers put pressure on a third person to induce the defendant to make sales of narcotics is relevant to an entrapment defense.
The holdings of these two cases are irreconcilable with the majority holding here. The interpretation given to the hearsay statute in this case  that a statement of a nontestifying informant as to a plan to setup a defendant for prosecution is not admissible as a hearsay exception to explain subsequent state action, where the defense of entrapment is asserted, so long as the state does not dispute what the informant later did  simply makes no sense.
I would grant the motion for rehearing.
NOTES
[1] The recorded telephone conversation disclosed, in pertinent part, the following exchange between Morris and Donaldson:

DEFENDANT MORRIS: "Hello."
MR. DONALDSON: "Gene?"
DEFENDANT MORRIS: "Yeah."
MR. DONALDSON: "What's up?"
DEFENDANT MORRIS: "Nothing. What's the scoop?"
MR. DONALDSON: "All right, he's gonna do it like this here  he said he'll show you the money. He said it's fine."
DEFENDANT MORRIS: "All right."
MR. DONALDSON: "He go  you only see half unless you wanna bring the stuff. He said you can see the whole thing and we can do it there, but you can see the money as long as you want to see it in the parking lot where no one can get ripped  he go because  he wanna do it in the parking lot is it's quite normal for people to come out of the parking lot and open and close trunks and he'll have the money in the trunk and what happens, he'll open it up. He'll let you see the money. You can either  if you want, bring it. He said you can bring it in your car and park somewhere and meet us in his car or you can come see it, see the money and "
DEFENDANT MORRIS: "Come see me "
.....
DEFENDANT MORRIS: "All right. Okay, man, you better make sure this ain't no f____ set-up, boy."
MR. DONALDSON: "Okay."
DEFENDANT MORRIS: "Did you hear me?"
MR. DONALDSON: "Huh?"
DEFENDANT MORRIS: "Did you hear what I said?"
MR. DONALDSON: "Yeah."
DEFENDANT MORRIS: "All right. Now, you're absolutely positive of these people?"
MR. DONALDSON: "Yeah. I'm positive. It's only gonna be and Joe, anyhow, so "
DEFENDANT MORRIS: "All right. You know the guy?"
MR. DONALDSON: "Yeah. I met him one time but, you know  I meet him "
DEFENDANT MORRIS: "Wait a minute. Wait a minute. All right. Fine."
MR. DONALDSON: "Well, look, I'll meet you at 4:00, okay?"
DEFENDANT MORRIS: "Four o'clock."
MR. DONALDSON: "I'll call you before I come."
DEFENDANT MORRIS: "All right."
MR. DONALDSON: "All right."
[2] In proffering Gotbaum's testimony, defense counsel stated:

MR. STRAUSS: He's going to testify that Freddie he's known Freddie for years and years, took him in as family. He's also going to testify 
.....
I believe he will also testify that Freddie called him, all right, and told him three months ago that, or four months ago, he was going to be setting up Gene.
.....
The last thing, Your Honor, I am proffering my words, not his, the last thing is that he would testify that Fred Donaldson took Quaaludes, LSD in high school. He went to this fellow for help, when, afterwards and his family, his father is a doctor, they tried to help Fred Donaldson. That he hallucinates. He's incompetent.
[3] Although the dissenting opinion asserts that the trial court precluded the defense from calling Donaldson as an adverse witness, the record reflects that defense counsel had sufficient opportunity to call Donaldson. The trial court stated:

I'm going to deny your motion at this moment. In the event you call Donaldson and Donaldson begins to play games or not answering your questions or if we get into any kind of activity, then I'm certainly going to consider your motion. But, so long as he answers your questions, I'm not going to treat him as a hostile witness until he makes some indication of it.
It is not the responsibility of this court to second guess the strategy of trial counsel; nevertheless, it is clear that defense counsel could have called Donaldson, either as a court witness or as a defense witness, and upon an appropriate showing, he would have been deemed a hostile witness.
[4] Under the objective or hypothetical person approach to entrapment, the dispositive question is whether a police agent used inducements likely to cause a hypothetically non-disposed person to commit the crime charged. The focus under the objective test is upon the police conduct in using improper inducements, and not upon the predisposition of the defendant. Since Arkansas applies the objective test for entrapment, the dissent's reliance on Spears v. State, 264 Ark. 83, 568 S.W.2d 492 (1978) is misplaced.
[5] Contrary to the contentions raised by the dissent, the court did not find predisposition as a matter of law, but properly sent the matter to the jury for its consideration as to the weight and sufficiency of the evidence bearing on the entrapment defense. The evidentiary basis for the jury's rejection of the entrapment defense has not been challenged on appeal.

The record indicates that far from being badgered, Morris even invited participation. The record reflects:
AGENT BRINSON: "Is it coming in?"
DEFENDANT MORRIS: "  listen, let me tell you something first. Let me tell you something first. If I wanted to rip you, I could have done that. I got no f____ rip  first of all, you know, if you want me to trust you, you got to trust me somewhere along the line. These people are saying the same thing."
.....
AGENT BRINSON: "  if I have a change in plans, you know, it's causing me headaches  "
DEFENDANT MORRIS: "... I assure you, man, there's no pressure, there's no worry. I got as much to lose as you... .
AGENT BRINSON: "No. Who I'm dealing with?"
.....
DEFENDANT MORRIS: "You ever heard of a m____-f____ who used to play for the Dolphins?" ... . "Named Mercury Morris?" ... . "You ever heard of that m____-f____? Well, this is me." ... . "... I won't f____ with nobody who doesn't have as much to lose as me. If the deal can go off, fine, everything is set and the place is on 97th... .
.....
DEFENDANT MORRIS: "You look at your product, that's the f____ way you're suppose to do it."
AGENT BRINSON: "I know how you're supposed to do it, but I thought I was dealing with you."
DEFENDANT MORRIS: "You are dealing with me  you are dealing with me  you are dealing with me straight up and you'll see how it goes off, it will be smooth, just like it  hey, man, listen."
.....
DEFENDANT MORRIS: "... somewhere along the line somebody's got to trust somebody."
AGENT BRINSON: "That's true."
DEFENDANT MORRIS: "Now, if I wanted you  I could  hey, that's right there, but I don't want that. I want you to come back again and again and again.
.....
DEFENDANT MORRIS: "Exactly  I'm telling you right now, you know, you'll be satisfied with this situation and you'll want to do it this way every f____ time."
.....
DEFENDANT MORRIS: "Street  I'm not looking to rip you and you are not looking to rip me, you don't know that and I don't know  the only way  you can  me prove it to you, you prove it to me, everybody is going like this here, you know "
.....
AGENT BRINSON: "Okay. Well, you know, if I can't square  I'll try to do, you know, something else tomorrow. If I can't do that, then we'll work it that way for now."
DEFENDANT MORRIS: "What's the matter, you scared?"
AGENT BRINSON: "I'm not scared."
DEFENDANT MORRIS: "Are you leery?"
.....
AGENT BRINSON: I need to make some connections out here."
.....
DEFENDANT MORRIS: "You see, man "
AGENT BRINSON: "You know, I don't know where you stand, where I am coming from. See, when you are in my type of business you don't trust too many people  you can't trust your own mother  brother."
.....
DEFENDANT MORRIS: "I understand it, man, but, you know, what you do is just like you're saying, you look  the kind of connection you're looking for is the kind of connection you're talking to."
.....
AGENT BRINSON: "Like I said, I must follow my conscience now."
DEFENDANT MORRIS: "Let me just tell you this, though, man: Here's the kind of situation where you come down, you got the money and they got the shit. Get the shit, you got the money, pick it up, you look at it, you see if you like it, and you take it. Nobody questions you... . So, you see from a vantage point of somebody who is here  they're established and hey, man, we want to meet you in the parking lot and do it, you know  by the same token to establish the kind of connections that you're looking for, that you want on a regular basis, of a quality material "
AGENT BRINSON: "Yeah."
DEFENDANT MORRIS: "I have that connection." (emphasis supplied) (expletives deleted)
[6] Agent Gilbert's affidavit relates in pertinent part:

6. On or about August 16, 1982, your Affiant contacted Special Agent Joseph Brinson, of the Florida Department of Law Enforcement, and requested that Agent Brinson act in an undercover capacity in order to meet with Eugene Morris, also known as "Gene", to purchase suspected cocaine.
7. On or about August 16, 1982, at approximately 6:00 PM, your Affiant observed Special Agent Brinson meet with a black male who introduced himself as "Gene" at the Dadeland Mall Shopping Center in Miami, Dade County, Florida. During the meeting the black male was observed driving a black/grey 1981 Cadillac Sevelle [sic], bearing Florida tag number XCS-882, accompanied by a white male identified to your Affiant by the confidential informant as "Ed".
.....
9. On August 16, 1982, at approximately 6:15 PM, your Affiant was advised by Special Agent Brinson that "Gene" offered to sell to Agent Brinson two (2) kilograms of cocaine for $58,000.00 per kilogram. Your Affiant was advised by Agent Brinson that "Gene" delivered to him a small tin foil packet of suspected cocaine as a sample. Your Affiant Gilbert was advised by Investigative Supervisor Karen Jacobson, of the State Attorney's Office, Eleventh Judicial Circuit of Florida that a field test of the sample indicated the presence of cocaine.
10. On August 16, 1982, your Affiant Gilbert was advised by Special Agent Brinson that he, Brinson, was told by Eugene Morris, also known as "Gene", that "Gene" could deliver two (2) kilograms of cocaine, however, that the sale and delivery could not occur at the Dadeland Shopping Center. Your Affiant Gilbert observed Special Agent Brinson meet with Eugene Morris, also known as "Gene", on August 16, 1982, at approximately 9:30 PM. Your Affiant was advised by Brinson that the meetings with Eugene Morris, also known as "Gene", occurred in order to discuss the sale and delivery of two (2) kilograms of cocaine.
11. On August 17, 1982, your Affiant Gilbert was advised by Special Agent Brinson that pursuant to several telephone conversations between Brinson and Eugene Morris, also known as "Gene", at telephone number (305) 666-3971 that Agent Brinson was instructed by Morris to proceed to 6200 S.W. 64th Court and pick up a one (1) ounce sample of cocaine. Your Affiant was advised by the confidential informant that telephone number (305) 666-3971, is located at the residence of Eugene Morris, also known as "Gene" at 6200 S.W. 64th Court, South Miami, Dade County, Florida. Your Affiant Gilbert was advised by Investigative Supervisor K. Jacobson that the Southern Bell Telephone Company list (305) 666-3971 to Eugene Morris at 6200 S.W. 64th Court, South Miami, Dade County, Florida.
12. On August 17, 1982, at approximately 7:00 PM, your Affiant Gilbert and other investigators from the State Attorney's Office, Eleventh Judicial Circuit of Florida surveilled Special Agent Brinson to 6200 S.W. 64th Court, South Miami, Dade County, Florida. Your Affiant Gilbert was advised by Special Agent Brinson that he, Brinson, met with Eugene Morris, also known as "Gene", inside the residence and that Brinson was offered one (1) ounce of suspected cocaine as a sample. Your Affiant Gilbert was advised by Special Agent Brinson that he, Brinson, took a small quantity of suspected cocaine from the one (1) ounce package from Eugene Morris, also known as "Gene" at 6200 S.W. 64th Court, South Miami, Dade County, Florida. Your Affiant Gilbert was present when a field test on the sample indicated the presence of cocaine.
13. On August 17, 1982, at approximately 9:45 PM, Your Affiant Gilbert and other investigators from the State Attorney's Office, Eleventh Judicial Circuit of Florida, observed Eugene Morris, also known as "Gene", meet with Special Agent Brinson on S.W. 67th Avenue and approximately S.W. 59th Street, South Miami, Dade County, Florida. Your Affiant Gilbert was advised by Special Agent Brinson that the purpose of the meeting was to deliver one (1) kilogram of suspected cocaine for $58,000.00[.]
14. At approximately 10:00 PM, on August 17, 1982, your Affiant Gilbert was advised by Agent Brinson that Eugene Morris, also known as "Gene", would not deliver the one (1) kilogram of cocaine in the parking lot and that Agent Brinson was instructed by Morris to go to 6200 S.W. 64th Court, South Miami, Dade County, Florida and pick up the cocaine.
[1] Another issue raised by the defendant is that the state's refusal to waive the legislatively mandated minimum sentence as to him alone because he refused to plead guilty to a charged offense was unconstitutional. See United States v. Jackson, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968) (a statute, violation of which is punishable by death on a jury's recommendation, but which assures no execution if the accused enters a guilty plea, is invalid because it encourages guilty pleas). It is further suggested that the statute, Section 893.135(3), Florida Statutes (1983), which authorizes the state, by motion to the court, to request that a sentence be reduced on a showing that the convicted person has provided "substantial assistance" in the prosecution of others involved, is being selectively enforced. The state responds that it (not the court) waived the mandatory sentence as to codefendant Kulins because he cooperated by pleading guilty. Of course guilty pleas are not what the legislature had in mind as "substantial assistance" when it hastily enacted the statute, sometimes referred to as the "60 Minutes" Act. The point has merit but I think it is dwarfed by the issue which has been fully addressed.
[2] The state's argument as to those cases will be addressed in the relevancy discussion.
[3] Under questioning at oral argument the state again conceded that it had found no authority for the proposition. There is none.